510 F.2d 769
 166 U.S.App.D.C. 389
 UNITED STATES of America, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
American Airlines, Inc., et al., and Northwest Airlines,
Inc., Intervenors.
UNITED STATES of America, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Braniff Airways, Inc., et al., and Northwest Airlines, Inc.,
Intervenors.
 Nos. 73--2116 and 74--1794.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 27, 1974.
Decided Jan. 31, 1975.
 
 James C. Hair, Jr., Atty., Washington, D.C., with whom Carla A. Hills, Asst. Atty. Gen., Irving Jaffe, Deputy Asst. Atty. Gen. and Robert E. Kopp, Washington, D.C., were on the brief, for petitioner.
 Robert L. Toomey, Atty., Washington, D.C., with whom Richard Littell, Gen. Counsel, O. D. Ozment, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel and Rozann M. Skozen, Atty., Washington, D.C., were on the brief for respondent. Also Jay L. Witkin and Thomas J. Heye, Washington, D.C., entered appearances for respondent.
 Jerrold Scoutt, Jr., Washington, D.C., with whom Ralph L. Kissick and John H. Quinn, Jr., Washington, D.C., were on the brief, for Braniff Airways, Inc. and others.
 James M. Verner and Ronald D. Eastman, Washington, D.C., were on the brief, for Intervenor Northwest Airlines, Inc.
 Before WILKEY, Circuit Judge, NICHOLS,* Judge, United States Court of Claims, and GASCH,** United States District Court Judge for the District of Columbia.
 NICHOLS, Judge:
 
 
 1
 Petitioner, United States, on behalf of the Defense Department (DOD), seeks review of Civil Aeronautics Board (CAB) Economic Regulations (ER) 819 and 861 (of August 28, 1973, and June 11, 1974, respectively). The effect of these ER's is that DOD owes, as stated by counsel roughly, an additional $5,000,000 to the intervenors, United States commercial airlines, for charter air services rendered to the Military Airlift Command (MAC) during the period July 1, 1972, to August 28, 1973.
 
 
 2
 The sole issue is the power of the CAB to correct an order founded on an error of fact and to make its correction in this case retroactive to a date not earlier than the initiation of the original proceedings. There is no challenge to the reasonableness of the rates as reset.
 
 
 3
 This case is different from the usual CAB-set public tariffs. Under 14 C.F.R. Part 288, the CAB merely prescribes the minimum rates which carriers must charge MAC, leaving the actual rates to contract negotiations between the carriers and MAC. 14 C.F.R. §§ 288.5, 288.6, 288.7, ER--536, 33 Fed.Reg. 6645, May 1, 1968; ER--786, 38 Fed.Reg. 745, January 4, 1973; ER--494, 32 Fed.Reg. 7901, June 1, 1967; and as otherwise amended. In actual practice, the minimum rates are usually also the contract rates. In theory the CAB is not setting rates under 49 U.S.C. § 1482(d), but is granting exemptions on terms under 49 U.S.C. § 1386(b)(1).
 
 
 4
 This procedure under Part 288 was established in 1960 with Congressional Committee concurrence after it was found that unlimited competition for MAC business resulted in too low an economic return to the carriers for the carriers to upgrade their equipment into the jet age. Under the present procedure, MAC pays reasonable profits to the carriers so that the carriers in turn can keep their emergency CRAF (Civil Reserve Air Fleet) equipped to DOD needs. To the extent that MAC fails to pay reasonable charter service fees, to that extent MAC's emergency CRAF resources deteriorate.
 
 
 5
 * Since the chronology of events is critical to the resolution of this case, the following table sets forth the important dates of the CAB proceedings:
 
 
 6
 December 1970 Informal rate review proceedings initiated by CAB request of cost data from carriers.
 
 
 7
 May 11, 1971 Carriers' formal petition for rate increases filed.
 
 
 8
 June 1971 CAB merges formal petition and informal proceedings into formal proceedings.
 
 
 9
 August 1971 Price freeze period (Aug. 1971--Mar. 1972) under the President's Economic Stabilization Program complicates and delays rate proceedings.
 
 
 10
 December 29, 1972 ER--786 (38 Fed.Reg. 745--755, Jan. 4, 1973) issues, raising minimum charter rates 2.66% retroactive to July 1, 1971.February 16 and 23, 1973 Carriers formally request reconsideration and amendment of ER--786, alleging errors as set forth hereinafter. They seek adjustment of minimum rates for the period beginning July 1, 1972.
 
 
 11
 March 14, 1973 DOD opposes reconsideration and amendment of ER--786.
 
 
 12
 June 5, 1973 Economic Draft Regulation 249 (38 Fed.Reg. 15368--373, June 11, 1973) issues, correcting some of 'errors' in ER--786 that carriers complained of.
 
 
 13
 July 2 and 3, 1973 Carriers and DOD file objections to draft regulation.
 
 
 14
 August 28, 1973 ER--819 (38 Fed.Reg. 23772--777, Sept. 4, 1973) issues, retroactively increasing rates to July 1, 1972, as sought by airlines, but delaying final decision on June 13--Aug. 12, 1973 freeze period pending a Cost of Living Council ruling.
 
 
 15
 March 12, 1974 DOD files a suit in this court to review legality of ER--819.
 
 
 16
 June 11, 1974 ER--861 (39 Fed.Reg. 20962--64, June 17, 1974 issues after April 16, 1974) letter-ruling from Cost of Living Council authorizes CAB to apply ER--819 rates to June 13--Aug. 12, 1973 freeze period.
 
 
 17
 October 29, 1974 Parties move consolidation of ER--819 and ER--861 review on grounds that only single common issue in either case: statutory power of CAB to make ER--819 rates retroactive to July 1, 1972, (in effect correcting ER--786 only for fiscal years after that date and leaving ER--786 rates for July 1, 1971--June 30, 1972, unchallenged). Consolidation motion and stipulations are accepted and granted by this court on Nov. 8, 1974.
 
 
 18
 November 1974 Carriers supplement record for appeal with parts of record from concurrent proceedings before Armed Services Board of Contract Appeals (ASBCA) in which DOD contends that CAB minimum rates do not bind DOD contracts.
 
 
 19
 The above table shows that formal proceedings commenced on May 11, 1971; that ER--786 covering rates from July 1, 1971, onward was issued December 29, 1972; that the CAB granted the carriers' timely request for amendment to ER--786 by increasing the rates for services on or after July 1, 1972, by ER--819 and ER--861; and that the real contest here is over CAB powers to correct its own factual errors in a post-trial proceeding. The question is important not only to past events, but to current proceedings in which CAB is trying to keep rates in line with rapidly escalating costs.
 
 II
 
 20
 It is obvious from ER--819 that the CAB has considered and rejected the DOD retroactivity position:We do not accept DOD's argument that the Board has no authority to alter rates retroactively to correct errors of fact. We would agree that amending rates retroactively merely on the basis of a review and finding that the return on investment was either greater or less than that predicted when the rates were set would be unjustified. However, that is not the case here. As we stated in EDR--249 (Economic Draft Regulation), the carriers brought to our attention in early 1973 specific errors made in establishing the fiscal 1973 rates in ER--786. In our opinion, the Board not only has the authority but the duty to correct its error, whether the resulting change increased or decreased the rates retroactively. (At 38 Fed.Reg. 23772 (1973)).
 
 
 21
 * * * For carriers as a group, investment per mile in 1972 rose by only 13.9 percent over the level recognized for rate purposes in ER--786. Hourly utilization declined by 13.6 percent. However these comparisons to ER--786 are somewhat misleading taken by themselves. The fact of the matter is that the MAC services actually performed in 1972 were substantially smaller in terms of miles flown than we projected in ER--786. The same is true with respect to the amount of investment allocated to these MAC services. The 13.6 percent drop in aircraft utilization in MAC services is reflective of the relatively high levels of hourly utilization on which the ER--786 rates were based, and those levels were in turn patterned after the high utilization rates achieved in earlier periods of high activity in MAC charters. It is clear that the substantial contraction of these operations is one of the factors underlying the rising unit cost trend and the carriers' less than satisfactory earnings' results. (At 38 Fed.Reg. 23773 (1973)).
 
 
 22
 Also, the CAB says that the drop in the mix of passenger carriage in the MAC operation from 80% to 50% masked the effect of inflation on the carriers' costs so that ER--786 failed to allow for it sufficiently.
 
 
 23
 It is clear from a reading of the disputed ER's that the CAB received and disposed of a large number of related and separate contentions raised by the various parties. However on this appeal, only the single issue of retroactivity power has been raised, considerably easing the burden on the court in reviewing the CAB regulations.
 
 
 24
 Before moving into a discussion of the legal issues surrounding retroactivity powers, it is necessary to point out that the DOD has not made--and indeed cannot--a good faith claim that it does not otherwise justly owe the carriers the money. The initial errors that were subsequently corrected arose, as noted above, from the false factual premises. Thus the CAB, which is charged with the duty in 49 U.S.C. § 1302, of maintaining a healthy and viable airline industry, was truly forced to correct its mistake in what it had set as an indefinite rate for the future. The $5,000,000 DOD would save if it were to prevail must be paid for somehow. If DOD does not pay for its services, the loss will fall initially at least on the Airlines' shareholders, a result which we find contrary to the principle of United States v. New York Central RR Co., 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929), discussed infra.
 
 III
 
 25
 In regard to the legal issues surrounding the retroactivity question, three points are decisive: that the CAB enjoys the same broad post-trial relief powers of any adjudicatory body in the Federal system; that none of the non-retroactive rate-making cases cited to the contrary apply to this case; and that regardless of nomenclature, the proceeding below was in fact a post-trial relief procedure comparable to one in a Federal court under F.R.Civ.P. 60.
 
 
 26
 A. The DOD at the outset mistakenly relied on 49 U.S.C. § 1482(d), which permits CAB, after hearing, etc., to fix rates 'thereafter to be demanded * * The CAB was not fixing rates under that section here.
 
 
 27
 Post-trial relief used to be a matter of filing the proper writ--and the case law from the 19th century is full of disputes over the metes and bounds of the various writs. However, since World War II times the Federal courts have had the simple and broad language of Rule 60 to go by, escaping in large part from the narrow confines of such writs as coram nobis and certiorari. See, 7 Moore's Federal Practice 60.14 and 60.27.
 
 
 28
 Case law under Rule 60 indicates that the trial court's discretion is broad, that regulatory and other boards substituting for trial courts in finding facts have similar broad discretion, and that liberal relief is the guiding principle of Rule 60.
 
 
 29
 In American Trucking Ass'ns v. Frisco Co., 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958), regarding the ICC (Interstate Commerce Commission) power to correct mistakes, the Court said:
 
 
 30
 It is axiomatic that courts have the power and the duty to correct judgments which contain clerical errors or judgments which have issued due to inadvertence or mistake. Gagnon v. United States, 193 U.S. 451, 24 S.Ct. 510, 48 L.Ed. 745. Rule 60(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., recognizes this power and specifically provides that '(c)lerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders.' A similar power is vested in the Interstate Commerce Commission. Section 17(3) of the Act * * * that: 'The Commission * * * * * To hold otherwise would be to say that once an error has occurred the Commission is powerless to take remedial steps. This would not, as Congress provided, 'best conduce to the ends of justice.' In fact, the presence of authority in administrative officers and tribunals to correct such errors has long been recognized--probably so well recognized that little discussion has ensued in the reported cases. Bell v. Hearne, (60 U.S. 252,) 19 How. 252, 15 L.Ed. 614.
 
 
 31
 In the above case, the error was the inadvertent omission of the right-to-amend clause from the certificate of public convenience and necessity that ICC had issued.
 
 
 32
 In Klapprott v. United States, 335 U.S. 601, 613--614, 69 S.Ct. 384, 93 L.Ed. 266 (1949), Justice Black gave a similar broad interpretation to Rule 60(b). He said at 614, 69 S.Ct. at 390:
 
 
 33
 * * * Furthermore 60(b) strongly indicates on its face that courts no longer are to be hemmed in by the uncertain boundaries of these and other common law remedial tools. In simple English, the language of the 'other reason' clause, for all reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice.
 
 
 34
 In Bridoux v. Eastern Air Lines, 93 U.S.App.D.C. 369, 214 F.2d 207, 209--210 (1954), this court through Judge Fahy stated in regard to Rule 60(b) that:
 
 
 35
 * * * It has long been held in this jurisdiction that an application to vacate a judgment is addressed to the sound discretion of the trial court, the exercise of which will not be disturbed on appeal except for abuse. * * * We do not understand Rule 60(b) to change this basic principle. * * * But the Rule does bring to bear a more liberal attitude than pertained before its adoption. * * *
 
 
 36
 Thus it is unassailable that the Federal courts have powers under Rule 60 to correct their errors, within the prescribed time limits, in the exercise of sound discretion. In light of the place that the CAB, and certain other regulatory boards and commissions hold, as substitutes for Federal trial courts as fact finders, in certain areas of limited subject matter jurisdiction, it seems reasonable that they have equally broad discretion to correct their factual mistakes.
 
 
 37
 B. However, in the area of utility rate-setting, Rule 60 type relief is subject to statutory limits.
 
 
 38
 The statute that governs ICC, 49 U.S.C. § 15(1), specifies that:
 
 
 39
 * * * the Commission is authorized and empowered to determine and prescribe what WILL be the just and reasonable individual or joint rate, fare, or charge, or rates, fares, or charges, TO BE THEREAFTER observed in such case, * * *
 
 
 40
 The DOD has cited to us several cases that interpret that statute quite literally, requiring all rate-setting by the ICC to be prospective only. Arizona Grocery v. Atchison, Topeka & Santa Fe RR, 284 U.S. 371, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Brimstone RR. & Canal Co. v. United States, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928); and United States v. Baltimore & Ohio RR., 284 U.S. 195, 52 S.Ct. 109, 76 L.Ed. 243 (1931). The United States was not a party as a user of carrier services, in those cases, but as the party sued for review of an ICC decision affecting others.
 
 
 41
 The broad scope that DOD seeks to give these cases is shattered by a contemporary case dealing with mail rates, which involve essentially a two-party relationship between Government and carrier, regulated by the ICC: United States v. New York Central RR. Co., 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619 (1929). The Supreme Court, per Mr. Justice Holmes, affirming a United States Court of Claims decision, and deciding on both statutory intent and Fifth Amendment just compensation grounds, stated that, once sovereign immunity had been waived by Congress, the Government was constitutionally liable for the full retroactive fares due on services and benefits the Government received, back to the date the proceeding was commenced.
 
 
 42
 The railroad's mail service was compulsory, a criminal fine being prescribed for refusal to carry Government mail. This of course made Holmes' invocation of the Fifth Amendment more appropriate than it would be here. The parties here do not claim that the Fifth Amendment directly supports the CAB's position. However, the statutory construction that imputes to Congress a desire to have the ICC settle the Government's entire liability, back to the date of petitioning the ICC, is in point. Not only is there lacking any statutory language to confine the CAB to rates thereafter to be assessed, but there is lacking any reason why such a restriction should be desired, in the context of contractual relations existing between carrier and Government rather than between carrier and public. The natural thing is that the CAB should have, as the ICC was held to have, full power to deal with the situation before it. Limited retroactive adjustment of the prices the Government pays for goods and services (e.g., Renegotiation Act of 1951, 50 U.S.C. (App.) § 1211 and ff.) is too common to be regarded as anomalous or to offer administrative difficulty.
 
 
 43
 In setting rates for carriage of airmail, the authority of the New York Central case carries over, despite the relative absence of compulsion, to the extent that rates retroactive to commencement of the proceeding are permissible. TWA v. Civil Aeronautics Board, 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911 (1949). Mr. Justice Douglas said at 605, 69 S.Ct. at 758:
 
 
 44
 * * * For the rates of carriers and other utilities fixed by public authorities, while usually prospective, are sometimes made retroactive to the date of the commencement of the rate-making proceeding. See United States v. New York Central R. Co., 279 U.S. 73, (49 S.Ct. 260, 73 L.Ed. 619). * * *
 
 
 45
 This conclusion of course was much aided by the provision as to airmail rates, now 49 U.S.C. § 1376, that the Board may make them effective from such 'date as it shall determine to be proper.' However, the legislative history as cited by Justice Douglas in a footnote, and set forth by this court in the decision below, 83 U.S.App.D.C. 358, 169 F.2d 893 (1948), shows that the provision was intended to make the New York Central rule applicable to airmail rates, despite the absence of compulsion, resolving a dispute among ICC Commissioners, some of whom would have limited the case to compulsory carriage of mails only.
 
 
 46
 The court is required to decide whether the Arizona Grocery or New York Central line of cases are to be followed. In the absence of statute directly applicable, we may properly consider 49 U.S.C. § 1376 as a legislative decision on a closely related and analogous matter. Moragne v. States Marine Lines, 398 U.S. 375, 406, 90 S.Ct. 1772, 26 L.Ed.2d 339 and ff. (1970). There can be no doubt where this will lead us, for, as we have already said, regulation of rates for Government overseas air charters is far more closely related to regulation of rates for air carriage of mail, than it is to regulation of rates charged travelers and shippers by air generally.
 
 
 47
 Several other factors work against a blind adherence to the Arizona Grocery line of cases.
 
 
 48
 The CAB statute is different (and less restrictive):
 
 
 49
 The Board is empowered to perform such acts, to conduct such investigations, to ISSUE and AMEND such orders, and to make and AMEND such general or special rules, regulations, and procedure, pursuant to and consistent with the provisions of this chapter, as it shall deem necessary to carry out the provisions of, and to exercise and perform its powers and duties under, this chapter. 49 U.S.C. § 1324(a).
 
 
 50
 Lastly there are due process, fairness and notice conditions implicit in any Government action. It is one thing to surcharge someone retroactively without prior notice and another thing to exact the same surcharge with prior notice. In this case, the Government was very clearly a party to the whole rate proceeding, the DOD submitting briefs and its objections at every step of the way. In fact a major cause of the error that had to be corrected was DOD failure to ensure that the CAB acted with a correct forecast of DOD MAC needs.
 
 
 51
 C. The DOD contends that, even if a rehearing procedure could retroactively adjust rates back to the date the proceeding started the CAB procedure below was not a rehearing but an entirely new proceeding. The CAB brief points out:
 
 
 52
 In general, we do not accept petitions for reconsideration of adopted rules because of concern for the adequacy of notice of the filing by interested persons since in a rule making proceeding as opposed to a formal investigation there are no parties upon whom service of petition is required. For this reason, in the typical case, to insure interested persons notice of the filing we treat a so-called petition for reconsideration as an original petition for rule making and institute a new proceeding. In the present case, however, the DOD, the only party affected by the rates in question, had notice of the filing of the petition, and has afforded itself of the opportunity to make its views known on the matters at issue. Under these circumstances, we find it appropriate to accept the carriers' petition, especially considering that the relief requested is more nearly akin to reconsideration than it is a petition for rule making, and to act thereon. (ER--845, adopted May 1, 1974).
 
 
 53
 Thus, since the reconsideration afforded the parties' objections to ER--786 was generally of the same type as afforded by Rule 60, we conclude that in substance the CAB provided Rule 60 type relief, by whatever name such relief was called.
 
 IV
 
 54
 Thus in light of the case law under Rule 60, the position of the CAB as an agency in the Federal adjudicatory system, the broad statutory powers given the CAB, the case law applicable to these statutory powers, and the absence of any compelling, countervailing considerations, we conclude that the CAB acted within its statutory authority when it granted the airlines' petition for rate increases retroactive to July 1, 1972, by correcting factual errors in its earlier ER.
 
 
 55
 Further, under the doctrine reaffirmed in Slick Airways v. United States, 154 Ct.Cl. 417, 292 F.2d 515 (1961), and Emery Air Freight Corp. v. United States, 205 Ct.Cl. 49, 499 F.2d 1255 (1974), there is no basis in law for the DOD to argue that DOD is not obligated to pay the minimum rates set by the CAB and charged by the carriers under 49 U.S.C. § 1373(b); and contract clauses to the contrary are void as contrary to Federal statutes.
 
 
 56
 The orders of the Civil Aeronautics Board, Economic Regulations 819 and 861 (of Aug. 28, 1973 and June 11, 1974, respectively) are affirmed, and the petitions of the United States in both actions are dismissed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 **
 Sitting by designation pursuant to 28 U.S.C. § 292(a)