CITY OF LONG BEACH, Appellant,

v.

DEPARTMENT OF ENERGY, et al., Appellees.

CHAMPLIN PETROLEUM COMPANY, Appellant,

v.

DEPARTMENT OF ENERGY, et al., Appellees.

Nos. 9–85, 9–86.

Temporary Emergency Court of Appeals.

Argued Oct. 10, 1984.

Decided Jan. 4, 1985.

Robert G. Austin, Deputy City Atty., Long Beach, Cal., with whom Robert W. Parkin, City Atty. for Long Beach, Long Beach, Cal., were on the briefs for appellant City of Long Beach.

Joseph C. Bell, Hogan & Hartson, Washington, D.C., with whom Jeffrey N. Gibbs, Washington, D.C., of the same firm were on the briefs for appellant Champlin Petroleum Co.

Samuel Soopper, Washington, D.C., with whom Thomas H. Kemp, Dept. of Energy, Washington, D.C., were on the briefs for appellee Department of Energy.

Before DAUGHERTY, CRAIG and McNICHOLS, Judges.

McNICHOLS, Judge.

The Appellant City of Long Beach commenced the present action in the United States District Court for the Central District of California against the Department of Energy (DOE) and Donald P. Hodel, Secretary of the DOE, to challenge an order issued by the Office of Hearings and Appeals (OHA) of the DOE. The order required the City of Long Beach to disgorge itself of $963,459 the DOE claims the City received as a result of an erroneous calculation the OHA made in determining the price at which Long Beach could sell petroleum produced by Long Beach. Subsequent to the City of Long Beach commencing the present action, the District Court allowed Appellant Champlin Petrole-

um Company to intervene as a matter of right pursuant to F.R.C.P. Rule 26(a). Champlin Petroleum alleged that the City of Long Beach had acted in part on Champlin's behalf during the proceedings before the OHA and feared that Champlin might in turn be liable to the City of Long Beach. All three parties agreed there was no material issue of fact and submitted the case to the trial court on cross motions for summary judgment. The District Court granted the Department of Energy's motion for summary judgment and denied the City of Long Beach's and Champlin's motions for summary judgment. The City of Long Beach and Champlin Petroleum appeal.

Pursuant to the Emergency Petroleum Allocation Act of 1973 [1] the United States Department of Energy was authorized to issue Mandatory Petroleum Price and Allocation regulations, 10 C.F.R. Part 212. The Mandatory Petroleum Price and Allocation regulations, inter alia, initiated a regulatory scheme governing the price at which domestically produced crude oil could be sold. The regulatory scheme created a "two-tier" pricing system which system imposed a ceiling on the price at which producers of crude oil could sell their oil. Producers of crude oil producing on property for a given month at a level of production less than the corresponding month's 1972 level of production were required to sell at lower-tier prices. 10 C.F.R. §§ 212.73, 212.74 (1981). [2]

The Appellants, City of Long Beach and, Champlin Petroleum Company were at all times material herein working interest owners engaged in the production and sale of crude oil from property known as the Fault Block II Unit (the Unit), Wilmington Oil Field in Los Angeles County, California. Long Beach owns a 10.0001% interest and Champlin owns a 72.4290% interest in the

Unit. Mobil Oil Company owns the remaining 17.5709% interest but is not a party to this action. In addition to being a working interest owner, Long Beach acted as the "operator" for a segment of the Unit. [3]

Frequently, the ceiling prices imposed pursuant to 10 C.F.R. Part 212 would not be adequate to cover the costs of production. In such cases, an oil producer could apply to the Department of Energy for "exception relief" from the ceiling prices. Department of Energy Organization Act (DOEOA), § 504, 42 U.S.C. § 7194; 10 C.F.R. § 205.50 (1981), et seq. The DOE could grant exception relief upon a showing of "serious hardship or gross inequity" resulting from the ceiling prices. 10 C.F.R. § 205.50(a)(1). The Department of Energy required the exception relief applicant to file with the DOE detailed data relating to the cost of production. The DOE would use the submitted data to determine the amount of exception relief to which the oil producer would be entitled. The exception relief would issue in the form of an order allowing the oil producer to sell at the upper tier price a certain percentage of the oil produced.

Beginning in 1976, the working interest owners in the Unit found the federal ceiling prices for crude oil produced from the Unit inadequate to cover the costs of production. The City of Long Beach therefore made, from time to time, application for exception relief on behalf of Long Beach and the two other working interest owners (e.g. Champlin and Mobil Oil).

On May 17, 1979, Long Beach filed one of its periodic applications for exception relief; it is this May 17 application that gave life to the present controversy. On July 31, 1979 the DOE Office of Hearing and Appeals (OHA) granted exception re-

---

1. 15 U.S.C. § 751 et seq.

2. On January 28, 1981, petroleum and petroleum products were exempted from price controls by Executive Order Number 12287, 48 Fed.Reg. 9909 (January 30, 1981). Administrative actions pending at decontrol, like this case, were not affected by the Executive Order.

3. The operator of a petroleum producing property actually controls the day-to-day operations of the property, while working interest owners are merely the lessees of the right to develop the property's subsurface mineral rights. See Williams & Myers, *Manual of Oil and Gas Terms*, 656 (1981).

lief for the period commencing July 1, 1979 and ending December 31, 1979.

The OHA based its decision upon a finding that the operating costs of the Unit had continued to increase at such a rate that the working interest owners had no incentive to continue production without relief from the regulations, and thus that the exception relief previously granted concerning the Unit should be extended. OHA's final decision and order allowed the working interest owners to sell 72.58% of the crude oil produced from the Unit during the July to December period at upper tier ceiling prices. The OHA based its decision upon the data Long Beach submitted to the OHA. The figures Long Beach submitted were admittedly correct. The fault for any error, therefore, rests with the Department of Energy and its Office of Hearings and Appeals. Subsequent to the issuance of the final order of the OHA, the appellants commenced the selling of 72.58% of the crude oil produced from the Unit at the upper-tier prices.

On August 8, 1979, Long Beach sent a letter to OHA alerting the OHA to a possible error in the DOE's calculations of Unit operating cost. More specifically, the OHA had used $8.74 per barrel in calculating the unit operating cost for the period when $8.06 correctly reflected the cost per barrel. Long Beach contended, however, that the OHA should not correct the error because the higher cost figure more accurately reflected the costs appellants were incurring.

On November 15, 1979, Long Beach filed applications for extension of the exception relief for the Unit for another six-month period on behalf of Long Beach and on behalf of the other working interest owners. The OHA on December 21, 1979 issued a proposed decision and order extending the exception relief earlier granted to the City of Long Beach. In the extension, the OHA held that recovery of increased

operating expenses could be most effectively accomplished by permitting the City of Long Beach to sell 34.17% of the crude oil produced from the Unit for the benefit of the working interest owners at upper-tier ceiling prices.

In the proposed decision and order, the OHA acknowledged the error to which Long Beach had alerted them on August 8, 1979. The OHA specifically stated that as a result of the error, Long Beach received an amount of exception relief in excess of the amount as should have been determined pursuant to the methodology set forth in *Great Southern*.[4]

To rectify the error, the OHA directed Long Beach to submit a report detailing the revenues received as a result of the claimed excessive relief. The OHA stated that the DOE would thereafter take appropriate action to assure the repayment of any excessive revenues that the working interest owners received. On January 25, 1980, Long Beach objected to the portion of the OHA's order relating to correction of the error in the July, 1979 proceedings. Long Beach essentially argued that the DOE should be estopped from correcting the computational error after substantial reliance by the City.

Three and one-half years later, on June 6, 1983, OHA issued a final decision and order regarding the excess relief received by the working interest owners during the last six months of 1979. The OHA affirmed its proposed decision granting the City relief for the first six months of 1980. However, the OHA rescinded the portion of the July 31, 1979 decision and order which authorized the sale of 72.58% of the crude produced to be sold at upper-tier prices and substituted a paragraph authorizing the sale of 61.41% of the crude oil produced at upper-tier prices. The OHA rejected the City's contention that it should retain the excessive relief it had received as a result

4. The standard governing the determination of exception relief for crude producers was first enunciated by OHA in Applications for Exceptions Filed by Crude Oil Producers, 43 Fed.Reg. 58514 (December 14, 1978). It is typically known as *Great Southern* relief, after the case of that name.

of the miscalculation on the grounds of estoppel.

During the three and one-half year period between the filing of objections to the proposed order and the issuance of the June 6, 1983 final decision and order, negotiations had been conducted between DOE and Long Beach and between DOE and Champlin, regarding each appellants' compliance with Mandatory Petroleum Allocation and Price Regulations. In February, 1982, a Consent Order was entered into between DOE, Long Beach and the State of California. In July, 1982, a Consent Order was entered into between DOE and Champlin.

After OHA issued the June, 1983 Decision and Order, Long Beach in compliance thereto paid $963,459, into an escrow account held by DOE where the money presumably remains.

Long Beach filed this action in the United States District Court for the Central District of California on September 16, 1983. The trial court subsequently granted Champlin Petroleum Company's motion to intervene. All parties agreed that no genuine issues of fact existed and all parties moved for summary judgment. The District Court denied the motions for summary judgment filed by Long Beach and Champlin, and granted summary judgment in favor of the DOE.

In its Findings of Fact and Conclusions of Law the District Court held that the miscalculation made by OHA in its July, 1979 decision and order was a ministerial error which was properly corrected by the agency in the subsequent June, 1983 decision and order. The court held that, as OHA has broad and flexible remedial powers with respect to exception relief, OHA had the right to require the refund of $963,459 and the authority to have the money placed in escrow pending the determination of its proper recipients.

The court rejected Long Beach's assertion that the OHA was estopped from requiring the repayment by the passage of three and one-half years' time. Assuming, arguendo, that estoppel could be asserted against the federal government, the court ruled that Long Beach had not proved a case of estoppel.

The District Court further found that the consent order entered into by DOE, Long Beach and the State of California resolved only the specific claims DOE had against Long Beach. The present dispute, said the trial court, is not one of those claims to which the consent order refers.

Further the District Court held that the Consent Order entered into between Champlin Petroleum and the DOE does not prevent the DOE from proceeding against Long Beach for repayment of the erroneously granted exception relief. The court found that based on the terms of the order, neither party had the administrative proceedings here in issue in mind when entering into the consent agreement. The District Court further found that the consent order only settled claims by the DOE against Champlin relating to Champlin's compliance with the federal petroleum price and allocation regulations. The present action, said the trial court, did not constitute a claim by the DOE against Champlin relating to Champlin's compliance with the federal petroleum price and allocations regulations. The District Court also held that the consent order undertook to resolve only the issues raised during a DOE audit of Champlin's compliance with the Federal petroleum price and allocation regulations. The court found that the exception proceedings at issue was not a matter covered by the audit of Champlin. Finally, the District Court held that the City of Long Beach was not an "agent" of Champlin Petroleum Company as the term "agent" is used in the consent order; therefore, the action against Long Beach was not an action against Champlin Petroleum Company. The trial court did not reach the DOE's contention that Champlin Petroleum was barred from raising the consent order by Champlin's failure to raise the order at the administrative proceedings.

## ISSUES ON APPEAL

The parties present five issues to this court on appeal:

1. Whether the district court correctly ruled that the Office of Hearings and Appeals of the Department of Energy had the authority to retroactively correct the July 31, 1979 decision and order of the OHA and direct Long Beach to deposit $963,549 in escrow.

2. Whether the district court correctly ruled that the delay of three and one-half years did not operate to estop DOE from modifying the July 31, 1979 decision and order and directing Long Beach to deposit $963,549 in escrow.

3. Whether the district court correctly ruled that the consent order entered into between the DOE and Long Beach did not bar DOE's right to recoup the excessive exception relief granted to Long Beach for the period from July 1, 1979 through December 31, 1979.

4. Whether the district court erred by considering the consent order entered into between DOE and Champlin in its review of the DOE order directing Long Beach to deposit $963,549 into escrow.

5. Whether the district court correctly ruled that the consent order entered into between DOE and Champlin did not bar DOE's right to recoup the full $963,549 in excessive exception relief from Long Beach.

## DISCUSSION

■ On this appeal we are asked to review the decision of the United States District Court for the Central District of California. Because all parties stipulated to the District Court that no material issue of fact existed and the District Court decided this case upon summary judgment, we have the power to review the issues raised on summary judgment de novo.

■ In reviewing the District Court's decision in the present case we review an agency's interpretation and enforcement of its own regulations. The judicial review of an agency's interpretation of a statute and regulations promulgated pursuant thereto is a limited one. *Amtel Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (TECA 1976). "[W]here administrative control has been congressionally authorized, the judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." *Pasco, Inc. v. Federal Energy Administration, et al.*, 525 F.2d 1391, 1400 (TECA 1975), quoting from *Pacific Coast Meat Jobbers Assoc. v. Cost of Living Council*, 481 F.2d 1388, 1391 (TECA 1973), quoting from *Mississippi Valley Barge Co. v. United States*, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934). In light of the principles stated above we approach the issue the parties have raised on appeal.

### I.

The City of Long Beach initially contends that the Office of Hearings and Appeals of the Department of Energy was without the authority to, in a subsequent exception relief proceeding, convert or modify a final decision and order issued by the OHA so as to reduce the exception relief previously granted and order a refund be made and deposited into an escrow account. The City maintains that the DOE had neither the regulatory power nor the inherent power to order such action.

### A.

In support of the City's proposition that the OHA was not vested with regulatory power to correct arithmetic errors made in the course of exception relief proceeding, the City alleges that nowhere in 10 C.F.R. Part 205, Subpart D [5] is there authority for, in the context of a subsequent exception relief proceeding, rescinding part of a previously issued decision and order granting

5. 10 C.F.R. § 205.190 defines the scope of the regulations contained in 10 C.F.R. Subpart O.

exception relief.[6] The City of Long Beach's argument is not persuasive.

At 10 C.F.R. § 205.69 D(c) it is provided that the Director of the OHA, as presiding officer at exception relief proceedings, may:

> ... issue ancillary orders, reconsider any determination, or make any ruling or determination necessary to ensure that the proceedings specified in this subpart are conducted in an appropriate manner and are not unduly delayed.

From the record before us it is unclear whether the DOE relied upon 10 C.F.R. § 205.69 D(c) at the proceedings before the OHA. Nevertheless, the DOE cites the court to section 205.69 D(c) in this proceeding. We accept the DOE's invitation to consider the applicability of Section 205.69 D(c) and find that Section 205.69 D(c) does, in fact, give the OHA the power to order the City to disgorge itself of the $963,549 in excess relief and deposit it in escrow. It is true that Section 205.69 D(c) does not specifically clothe the OHA with the power to issue the remedial order here in question. But the DOE interprets Section 205.69 D(c) as giving the OHA the authority to issue the order in dispute here. It is well established that in reviewing the administration of exception relief proceedings, the courts give "great deference" to the agency's interpretation of its regulations. See e.g. *Amtel Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (TECA 1976); *Powerine Oil Co. v. Federal Energy Administration*, 536 F.2d 378, 379, 385–386 (TECA 1976). The rationale for giving great deference is the difficulty of administrating "complex programs necessary to deal with the petroleum industry." *Powerine Oil Co. v. Federal Energy Administration*, supra, 536 F.2d at 386. See also, *Union Oil Co. v. DOE*, 688 F.2d 797, 807 (TECA 1982), cert. denied, 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983); *General Crude Oil Co. v. DOE*, 585 F.2d 508, 515 (TECA 1978), cert. denied, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979). The great deference the courts give to the administrative agencies in deciding whether to grant or deny exception relief must also be given to the agencies when the agencies are correcting errors made in the course of exception relief proceedings.[7] We, therefore, must give great deference

**6.** The City refers the court to 10 C.F.R. Subpart O of Part 205 and, more specifically, Section 205.199 I in support of the City's argument that Subpart D of part 205 (recall that Subpart D governs the conduct exception relief proceedings) contains no provision empowering the DOE with the authority to order the City to disgorge itself of the benefits of the excessive exception relief. 10 C.F.R. § 205.199 I clothes the DOE with the power to require a producer of oil to deposit into escrow funds necessary to eliminate or compensate for the effects of a *violation* of the regulations set out in 10 C.F.R. Parts 210, 211 and 212. In fact, all of Subpart O of Part 205 is concerned with remedying violations of Parts 210, 211 and 212. Section 205.-190(a) defines the scope of Subpart O: "This subpart establishes the procedure for determining the nature and extent of violations of the DOE regulations in Parts 210, 211 and 212." The City argues that if the DOE had the power to require an oil producer to deposit into escrow funds necessary to compensate for the effects of erroneously granted exception relief, Subpart D of Part 205 (Subpart D governs the conduct of exception relief proceedings) would contain comparable provisions to Subpart O of Part 205, 10 C.F.R.

The City likewise argues that the DOE has no authority to disburse the $963,459 deposited

with the DOE. Subpart V of Part 205 established a procedure for the distribution of money deposited with the DOE. But again Subpart V applies only in the context of remedying "the effects of a violation of the regulations of the Department of Energy." 10 C.F.R. § 205.280. If the DOE were meant to have the authority to disburse the funds the DOE had required be deposited in escrow in the context of an exception relief proceeding, a provision similar to those contained in Subpart V would have been included in Subpart D. For reasons stated in the body of this opinion we do not agree. 10 C.F.R. § 205.69 D(c) gives the OHA broad authority to correct errors made in the course of exception relief proceedings. We therefore hold, even though the City's argument is compelling, it is not persuasive.

**7.** The DOE cites the case *Delta Refining Company v. Federal Energy Administration*, 559 F.2d 1190 (TECA 1977) as case authority supporting the OHA's power to order repayment of excessive relief. The *Delta Refining* case is not on all fours with the present case because in *Delta Refining* the DOE's power to require refunds was made a condition of the relief granted. Apparently, the exception relief in the *Delta Refining* case was based upon projected figures.

to the DOE's interpretation of 10 C.F.R. § 205.69 D(c). As a result, we adopt the DOE's assertion that Section 205.69 D(c) gave the OHA the power to order the City of Long Beach to disgorge itself of the $963,549 earned as a result of the OHA arithmetic error in the July 1979 exception relief proceedings by depositing the sum in an interest bearing escrow account.

The City of Long Beach next contends that even if Section 205.69 D(c) gives the OHA the power to correct OHA's arithmetic error and to order the City to deposit the $963,549 in escrow, the OHA "unduly delayed" in so doing.[8] We do not agree.

Webster's Third New World International Dictionary (3rd Ed., 1964) lists the words "Improper", "Inappropriate", "Inopportune", "Excessive", "Immoderate", and "Unwarranted" as synonyms for the word "Unduly". In light of the complexity of the cases before the DOE and the difficulty of administering the regulations dealing with the petroleum industry as mentioned above, we cannot say that a delay of three and one-half years is improper, inappropriate, etc. We are especially unable to find the delay undue in light of the fact that the City knew on December 21, 1979 that the DOE intended to require the City to purge itself of the excessive profits. The proposed decision and order issued on December 21, 1979 provided:

> In order to rectify the error described above, Long Beach will be required to submit a detailed calculation of revenues obtained as a result of receiving excessive relief. The DOE will then take appropriate action to assume the repayment of any excessive revenues that the working interest received.

Joint Appendix at 211.

We hold that the DOE did not "unduly delay" in correcting the error pursuant to 10 C.F.R. § 205.69 D(c) the error it made in the July 1979 exception relief proceedings.

## B.

Even if the DOE did not have the regulatory power to require the City to disgorge itself of the excess relief pursuant to 10 C.F.R. § 205.69 D(c), the Department of Energy had the inherent authority to correct the error in question. The parties do not dispute the rule that an administrative agency has the power to correct orders containing inadvertent, ministerial errors. See *American Trucking Associations v. Frisco Transportation Company*, 358 U.S. 133, 145, 79 S.Ct. 170, 177, 3 L.Ed.2d 172 (1958); *Chlorine Institute v. Occupational Safety & Health Act*, 613 F.2d 120, 123 (5th Cir.1980), certiorari denied, 449 U.S. 826, 100 S.Ct. 89, 66 L.Ed.2d 30 (1980); *United States v. Civil Aeronautics Board*, 510 F.2d 769, 772–75 (D.C.Cir.1975). The power of administrative agencies to correct ministerial errors is similar to the power of the United States District Courts acting pursuant to F.R.C.P. Rule 60(a). *United States v. Civil Aeronautics Board*, 510 F.2d at 773. In Rule 60(a) cases, it has been held that "where the court errors in its mathematical computations as to the amount due the plaintiff, then relief can be had under the provisions of Rule 60(a)." *Chavez v. Balesh*, 704 F.2d 774, 776 (5th Cir.1983), quoting Moore's Federal Practice, ¶ 60.06[3] at 4057 (2d Ed.1982). See also *United States of America ex rel. of Mississippi Road Supply Company v. H.R. Morgan Inc.*, 542 F.2d 262, 269 (5th Cir.1976).

The City contends that the DOE's error in the present case was a "delibera-

---

The agency reserved the right to adjust the exception relief when the actual figures became available. *Delta Refining* does, however, add support to the proposition that DOE's authority with respect to administering exception relief is both flexible and broad. Id. at 1174. See also *Powerine Oil Company v. Federal Energy Administration*, 536 F.2d 378 (TECA 1976); *Marathon Oil Company v. DOE*, 642 F.2d 436 (TECA 1981).

8. 10 C.F.R. § 205.69 D(c) gives the power to the director of the OHA to, *inter alia,* reconsider any determination necessary to ensure that the proceedings specified in Subpart D are not "unduly delayed".

tive" error and consequently is not a correctable error. The City argues that the cost figure the DOE calculated was the amount at which the DOE intended to arrive; even though the amount later turned out to be wrong. See *Allied Materials Corporation v. Superior Products Company,* 620 F.2d 224, 225–226 (10th Cir. 1980). The City's argument once again is not persuasive. It is not disputed that the error consisted of some person employed with the DOE inadvertently using $8.75 as the cost per barrel figure rather than the $8.06 per barrel figure in calculating the Unit's costs. The DOE did not derive the cost per barrel figure; rather the City of Long Beach submitted the $8.06 figure to the DOE and a person with the DOE inadvertently used the $8.75 figure. Such an error constitutes a ministerial error correctable by the DOE. To hold otherwise would tax the court's sense of logic and justice. We, therefore, hold that the DOE acting through the OHA had the inherent power to correct the error the OHA made in determining the amount of exception relief to which the City was entitled.

## II.

■ The City of Long Beach argues that even if the Office of Hearings and Appeals had the power to require the City of Long Beach to disgorge itself of the proceeds of the erroneous exception relief, because of the long delay in finally ordering the City to divest itself of the excess proceeds, the DOE should, in essence, be estopped from ordering the City to disgorge itself of the excessive exception relief. The City's argument again must fail.

It is well established that the government may not be estopped on the same terms as any other litigant. "Fundamental to such a claim is that in addition to satisfying the elements of ordinary estoppel, the government conduct complained of must amount to affirmative misconduct." *Vic-*

*kars-Henry Corporation v. Board of Governor of the Federal Reserve System,* 629 F.2d 629, 635 (9th Cir.1980), quoting *Santiago v. Immigration and Naturalization Service,* 526 F.2d 488, 491 (9th Cir.1975), certiorari denied, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). See also *United States v. Ruby Company,* 588 F.2d 697, 701–703 (9th Cir.1978). The City argues that unreasonable delay can itself be characterized as affirmative misconduct. In *Sun Ji Yoo v. Immigration and Naturalization Service,* 534 F.2d 1325 (9th Cir.1976) the Ninth Circuit Court of Appeals held that the INS's unreasonable delay in certifying a visa application was so "oppressive" as to warrant estopping the INS from denying the applicant's visa. The court said the delay constituted "affirmative misconduct" for the purposes of holding the government estopped. Id. at 1328–1329.

■ Assuming a finding of unreasonable delay can be equated with the type of affirmative misconduct for which the government may be estopped, it becomes necessary to determine whether the delay in the present case was unreasonable. From the record before us we find that the delay was not unreasonable. Three and one-half years is undeniably a substantial amount of time. But in determining whether the three and one-half years is unreasonable we must balance the tendency of the government's wrongful conduct to work an injustice upon the City of Long Beach against the countervailing interest of the public not to be unduly damaged by the imposition of the estoppel. See e.g. *United States v. Ruby Company,* 588 F.2d at 697, 703 (9th Cir.1978). In the present case we cannot see how the three and one-half year delay has worked an injustice against the City of Long Beach. The City knew of the DOE's intent to correct the error in December of 1979 and had the use of $963,549 for the three and one-half year period.[9] Because we find that the City of

---

9. An additional justification for the three and one-half years delay is the fact that in Executive Order No. 12287, 48 Fed.Reg. 9909 petroleum products were exempted from the price controls of Part 212 of 10 C.F.R. The DOE consequently was faced with the task of winding-up the pending administrative actions as the pending action were unaffected by the executive order. It is

Long Beach did not suffer an injustice, we need not find a countervailing public interest. As a result, we hold that the no affirmative misconduct existed in this case justifying holding the government to be estopped.

Even if the DOE was guilty of affirmative misconduct, the City of Long Beach must prove a case of estoppel. More specifically, the City must show the following:

(1) The party to be estopped must know the facts;

(2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) the latter must be ignorant of the facts; and

(4) he must rely on the former's conduct to his injury. *Johnson v. Williford*, 682 F.2d 868, 872 (9th Cir.1982), quoting *United States v. Georgia-Pacific Company*, 421 F.2d 92, 96 (9th Cir.1970).

From the record before the court we are unable to find error in the District Court's findings to the effect that: the OHA of the DOE did not intend the City to rely upon the miscalculation; the City did not reasonably rely on the error in light of their knowledge concerning the error; and the City suffered no detriment as a result of the miscalculation.

First, the DOE informed the City of the OHA's intention to take action to correct the excessive exception relief. Having so informed the City, we hold that the OHA did not intend the City to rely upon the OHA's delay in making its final decision and order requiring the City to disgorge itself of the excessive exception relief proceeds. Likewise, we do not believe the OHA acted in a manner giving the City a right to believe the OHA intended the City to rely on the OHA's delay.

Second, we find that the City did not reasonably rely, if the City relied at all, upon the OHA's delay in issuing the Final Decision and Order. Once again the fact that the OHA informed the City of its intent to order the City to disgorge itself of the excessive relief precludes the City from relying upon the OHA's delay.

Finally, we find the City will not suffer any detriment as a result of the OHA's delay in issuing its Final Decision and Order. The City had the use of the $963,549 for the three and one-half years interim between the time the OHA informed the City of the OHA's intent to order the City to relinquish the proceeds of the excessive exception proceeding and OHA's Final Decision and Order.

█ The City of Long Beach asserts the City suffered detriment by having sold 72.58% of the crude oil produced during the last six months of 1979 in accordance with the July, 1979 order; and that the working interest owners are placed in the position of having sold 11.17% of the production at upper-tier ceiling prices without any legal authorization to do so.[10] The City argues that the working interest owners are thus placed in the position of being exposed to private lawsuits by those claiming to have purchased crude oil at a price in excess of the lawful price prevailing at the time of sale.[11] The City of Long Beach claims that

also important to note, that given the complexity of administering the regulations governing the price of oil, the agency charged with administering the regulations must be given great latitude. See e.g., *Amtel Inc. v. Federal Energy Administration*, 536 F.2d 1378, 1383 (TECA 1976); *Powerine Oil Company v. Federal Energy Administration*, 536 F.2d 378, 379, 384–386 (TECA 1976).

**10.** In the OHA's Final Decision and Order, issued on June 6, 1983, the OHA rescinded the portion of the July 31, 1974 Decision and Order authorizing the sale of 72.58% of the crude produced in Fault Block II to be sold at upper-tier prices and substituted a paragraph authorizing the sale of 61.41% of the crude oil produced at upper-tier prices.

**11.** Section 210 of the Economic Stabilization Act provides that any person who is overcharged for a good or service in violation of the Act may bring a private cause of action for recovery of the overcharge. If the person accused of overcharging intentionally overcharged, an action for treble damages will lie. 12 U.S.C. § 1904 note.

the entry by the OHA of an order requiring the City to disgorge itself of the proceeds of the excessive relief does not foreclose a complainant's right to institute such an action. See *Bulzan v. Atlantic Richfield Co.,* 620 F.2d 278, 283 (TECA 1980).

We find the City's argument unpersuasive on two grounds. First, this court in *Bulzan* stated that a court can make an adjustment of a liability award in a private action pursuant to Section 210 of the Economic Stabilization Act of 1970 in order to take into account a prior or subsequent payment of the same amount to the government. *Bulzan v. Atlantic Richfield Co.,* 620 F.2d at 283–284. We believe the power to make such an adjustment would prevent the City of Long Beach from suffering any detriment because of multiple liability.

Our second ground for finding the City's claim of detriment unpersuasive is we believe any potential private claims are probably barred by the statute of limitations. Section 210 of the Economic Stabilization Act does not specify a limitation period. When Federal Statutes do not provide for a limitations period, the Federal Courts must look to the most analogous State law of limitation. *Ashland Oil Company of California v. Union Oil Company of California,* 567 F.2d 984, 989 (TECA 1977); see also, *Runyon v. McCrary,* 427 U.S. 160, 179–80, 96 S.Ct. 2586, 2598–99, 49 L.Ed.2d 415 (1976). The *Ashland Oil* case arose, as did this case, out of actions taking place in the State of California. In *Ashland Oil,* this court found that a three-year period of limitations applied to actions for actual overcharges. This court found that applying the three-year statute of limitations would be in accord with the federal policy behind the act. *Ashland Oil,* 567 F.2d at 989–992.

 Given the three-year statute of limitations for actual damage claims, the key question is when the statute of limitations period begins to run. The question of accrual of a statute of limitations is a matter of federal law. *Cope v. Anderson,* 331 U.S. 461, 464, 67 S.Ct. 1340, 1341, 91 L.Ed. 1602 (1946); *Rawlings v. Ray,* 312 U.S. 96, 98, 61 S.Ct. 473, 474, 85 L.Ed. 605 (1940). In the present case the court is of the opinion the statute of limitations would begin to run when the overcharges were made in 1979. The only basis for extending the accrual of the statute of limitations is when a party fraudulently conceals the violation. *Ashland Oil Company,* 567 F.2d at 988. The City of Long Beach does not allege fraud in the present case. Given the fact that the alleged violation occurred more than three years ago, any civil suit against the City of Long Beach for overcharging on the sale of crude oil in the fall of 1979 would apparently be barred by the statute of limitations. As a result, we find that the City of Long Beach can suffer no detriment as a result of the OHA's three and one-half year delay in issuing its final decision and order.

Based on our holdings above, we determine that the City of Long Beach has not shown that the DOE is guilty of affirmative misconduct and has not proved the elements of estoppel.

### III.

 The City finally contends a consent order into which the City, the State of California and the DOE entered prevents the DOE from requiring the City of Long Beach to pay to the DOE the proceeds the City received as a result of the error the DOE made in the course of the exception relief proceedings held in July of 1979. The Consent Order in question is entitled: "Consent Order with the State of California and City of Long Beach, Case Nos. 940C00221, 940C00226 and 940C00227". The Consent Order states it is to resolve specified transactions.

Whether or not the document is ambiguous, the parties submitted the case to the trial court on a stipulated set of facts which facts are devoid of any extrinsic evidence to aid the consent order's interpretation.

The consent order refers, by number, in the heading to three specific audits which

are the subject of the order. In the body of the order paragraph 3 on page 2 reads:

3. The City and State, without admitting liability, desires to settle all potential civil liability between themselves and the ERA concerning the *specified transaction which allegedly occurred during the settlement period rather* than incur the expense and inconvenience of litigation. Similarly, the ERA believes it is in the best interest of the government and the general public to conclude the compliance proceedings now by means of this Consent Order (emphasis added).

Joint Appendix at 275.

Nothing we perceive in the order would support a view that the order was intended to settle any other claim or potential claim not a part of the three numbered audits. The City of Long Beach does not dispute the fact that the present controversy is not a part of the three referenced audits. We, therefore, find that the Consent Order in question refers only to the cases enumerated in the Consent Order's heading. Consequently, we must hold the Consent Order upon which the City relies does not bar the DOE from proceeding against the City of Long Beach to collect the proceeds of the excessive exception relief the City received in 1979.

## IV.

■ In its complaint in intervention Champlin Petroleum Company contends, in addition to the position presented by the City of Long Beach, that a "Global Consent Order" into which Champlin entered with the DOE bars the DOE from proceeding against Long Beach to recoup the excessive exception relief attributable to Champlin's working interest. Although the District Court rejected the claim on the merits, the DOE argues that the District Court erred by considering Champlin's Consent Order. The DOE argues that because the Champlin's Consent Order was neither raised before, nor considered by, the OHA at the administrative level Champlin waived the

right to raise the Consent Order before the Courts.

The general rule is that "absent exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative proceeding at the appropriate time." *Getty Oil Company v. Andrus*, 607 F.2d 253, 255–256 (9th Cir.1979), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 840, 59 L.Ed.2d 36 (1979). In accordance with this principle is Section 211(d)(1) of the Economic Stabilization Act, 12 U.S.C. § 1904, note. Section 211(d)(1) provides that judicial review of an agency's decision is limited to the issues of whether the challenged agency action is arbitrary and capricious, supported by substantial evidence, or beyond agency authority, based on the record developed before the agency. In *International Brotherhood of Electrical Workers v. Boldt*, 513 F.2d 1405 (TECA 1975) this court explained:

The term "substantial evidence" in particular has become a term of art to describe the basis on which an administrative record is to be judged by a reviewing court. This standard goes to the reasonableness of what the agency did *on the basis of the evidence before it*, for a decision may be supported by substantial evidence even though it could be refuted by other evidence that was not presented to the decision-making body (emphasis original).

Id. at 1406, quoting from *United States v. Carlo Bianchi & Company*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963).

Champlin Petroleum argues that the general rule, as stated above should not be applied in the present case because of paragraph 701 in the Consent Order which provides:

Champlin and DOE each reserves the right to institute a civil action in an appropriate United States District Court, if necessary, to secure enforcement of the terms of this Consent Order.

Joint Appendix at 141.

Champlin argues that if it could assert its rights under the Consent Order only by

first raising the Consent Order in an administrative proceeding, paragraph 701 would be rendered a nullity. We find Champlin's argument persuasive and hold that the trial court did not err in considering the Consent Order. We therefore, must consider whether the Consent Order bars the present action.

## V.

■ Although the District Court considered Champlin's Consent Order with the DOE, the District Court held that the Consent Order did not affect DOE's right to recoup the full $963,549 in excessive exception relief from Long Beach. We agree.

The Consent Order entered into between DOE and Champlin provided that the DOE would completely release all administrative and judicial civil claims against Champlin for alleged violations of federal petroleum price and allocation regulations during the period from January 1, 1973 through January 27, 1981. More specifically paragraph 101 of the Order provides:

> This Consent Order is entered into between Champlin Petroleum Company ("Champlin") and the United States Department of Energy for the sole purpose of settling and finally resolving, except those matters explicitly excluded herein, all civil and administrative disputes, claims and causes of action by DOE, whether or not heretofore asserted, against Champlin, its subsidiaries and affiliates *relating to Champlin's compliance with federal petroleum price and allocation regulations* (as defined herein) administered and enforced by DOE and its predecessor agencies during the period January 1, 1973 through January 27, 1981 (emphasis added).

Joint Appendix at 126.

Paragraph 501 provides in part:

> All pending and potential civil and administrative claims, whether or not known, demands, liabilities, causes of action or other proceeding by DOE *regarding Champlin's compliance with the federal petroleum price and allocation regulations* during the period covered by this Consent Order, whether or not heretofore raised by an issue letter, Notice of Probable Violation, Notice of Proposed Disallowance, Proposed Remedial Order, Remedial Order, Consent Order, or otherwise, or resolved and extinguished by this Consent Order ... (emphasis added).

Joint Appendix at 134–135.

Paragraph 502 provides:

> Compliance by Champlin with this Consent Order shall be deemed by DOE to constitute full compliance for administrative and civil purposes with all federal petroleum price and allocation regulations for the period covered by this Consent Order. Except as explicitly excluded herein, in consideration for performance under this Consent Order by Champlin, DOE hereby releases completely and for all purposes all administrative and judicial civil claims, demands, liabilities, or causes of action that it has asserted or may be able to assert before or after the date of this Consent Order against Champlin, *for alleged violations of the federal petroleum price and allocation regulations for the period covered by this Consent Order.* With respect to the matters covered by this Consent Order, DOE will not initiate any such administrative or civil matter, nor will DOE or its successors directly or indirectly aid in the initiation of any such administrative or civil matter, nor will DOE refer or cause to be referred any matter to the Department of Justice. DOE will not voluntarily participate adversely to Champlin in any administrative or civil judicial proceeding *related to Champlin's compliance with the federal petroleum price and allocation regulation* for the *period covered by this Consent Order,* or otherwise take action with respect to Champlin in derogation of this Consent Order... (emphasis added).

Joint Appendix at 135–136.

Paragraph 203 of the Consent Order defines "Federal petroleum price and allocation regulations" as used in the Consent Order to include all applicable DOE regulations, "and specifically includes 10 C.F.R.

§ 205 and 212." Champlin notes that the exception application was filed and acted upon pursuant to 10 C.F.R. § 205 and the price ceilings were imposed pursuant to 10 C.F.R. § 212.

What is apparent from each of the above excerpts is that the Consent Order refers only to Champlin's *compliance* with the DOE federal petroleum price and allocation regulations. In the present case the DOE does not allege that Champlin Petroleum is not in compliance with the regulations. Even if the City of Long Beach had not deposited the $963,549 in escrow and DOE tried to collect directly from Champlin Petroleum, the action would not be an action arising from Champlin's compliance, or lack of compliance, with the regulations; rather it would be an action to force compliance with an order of the DOE.

That Champlin's consent order was not intended to bar the DOE from collecting the $963,549 in excess exception relief is further evidenced by the fact that the consent order refers to an audit the DOE conducted of Champlin. The court is of the opinion that the parties intended the consent order's reference to the audit to be a limitation on the scope of the consent order. For example, paragraph 302 of the Consent Order provides:

> In 1973, DOE began a thorough and detailed audit to determine Champlin's compliance with the federal petroleum price and allocation regulations pertaining to the production, importation, refining and sale of crude oil and covered petroleum products. The responsibility for this audit was assumed by the OSC in November 1977. OSC conducted the audit on an intensified basis. The audit, now concluded, encompassed a review of Champlin's pricing and allocation policies and procedures and the manner in which Champlin applied the federal petroleum price and allocation regulations with respect to its production, importation, refining, and sale of crude oil and covered petroleum products during the period of the consent order.

Joint Appendix at 129–130.

In addition paragraph 304 provides:

> During the course of its audit, OSC raised certain issues with respect to Champlin's application of the federal petroleum price and allocation regulations. Champlin has contended that it correctly construed and applied the applicable regulations. Champlin undertook to enter this Consent Order in order to avoid the expense of potential, complex litigation and disruption of its business. The DOE believes this Consent Order provides a satisfactory resolution to the issues raised during the audit and that the Consent Order is in the public interest.

Joint Appendix at 130.

The Court reads these two paragraphs as indicating the scope the parties to the Consent Order intended the Consent Order to have. We are unable to derive from the paragraphs set out above, any indication that the Consent Order was intended to apply to the action at hand. The paragraphs set out above clearly state that the audit reviewed Champlin's pricing and allocation policies and procedures, and the manner in which Champlin applied the federal petroleum price and allocation regulations. In the present case, Champlin's pricing and allocation policies and the manner in which Champlin applied the federal petroleum price and allocation regulations are not drawn into question. The question in this case concerns the power of the DOE to order the City of Long Beach to pay into escrow the proceeds of the excessive exception relief erroneously granted to the City of Long Beach on behalf of the working interest owners in the Unit. The audit the DOE conducted upon Champlin Oil was not concerned with the excessive exception relief and, as a result, the consent order does not apply to the action at hand.

## CONCLUSION

In summary, we affirm the District Court in all respects. We find that the Office of Hearings and Appeals had the authority to correct the effects of the erroneous exception relief granted to the City of Long Beach on behalf of the working

interest owners in the Fault Block II Unit, Wilmington Oil Field in Los Angeles County, California. We further find that the delay of the DOE in issuing its final decision and order in the present matter did not operate to estop the DOE from requiring the City of Long Beach to purge itself of the proceeds of the erroneous exception relief. Finally we find that the consent order in to which the City and DOE entered was not intended to resolve the issues contested here.

As to Champlin Petroleum Company we find that the District Court properly considered the Global Consent Order into which the DOE and Champlin Petroleum Company entered; but find that the consent order applies only to violations of the federal petroleum price and allocation regulations. We hold that the present actions did not involve any violations or alleged violations of the federal petroleum price and allocation regulations.

## ADDENDUM

 Subsequent to oral argument in this case, Appellant Champlin, filed a Motion.to Dismiss for lack of subject matter jurisdiction. It is well settled that a party may raise a jurisdictional challenge at any stage of the proceedings and this Court will dismiss an action on appeal if jurisdiction is lacking.

 It is of interest to note that the Appellant, Long Beach, disagrees with Champlin and urges that the motion be denied. Likewise the DOE argues for jurisdiction.

Champlin contends that subject matter jurisdiction is wanting because the Emergency Petroleum Allocation Act of 1973 (EPAA) expired at midnight on September 30, 1981, 15 U.S.C. § 760g, and that the savings clause contained therein (Section 18) is to be interpreted only to allow the DOE to initiate or maintain "enforcement action" with respect to acts occurring prior to the expiration of EPAA. The holding in *United States v. State of California*, 504

F.2d 750 (TECA 1974) is relied on for this proposed interpretation.

It is clear that the present proceeding is not an enforcement action, but is an exception relief proceeding. However, this can be of no comfort to Champlin in its attack on jurisdiction.

Section 18 of EPAA states in pertinent part:

> The authority to promulgate and amend any regulation or to issue any order under this chapter shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil or criminal, not finally determined on such date, nor any administrative, civil or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.

15 U.S.C. § 760g.

We find this a clear authority for the DOE to complete exception relief proceedings, such as this one, not finally determined on the date of the expiration of the EPAA.

*United States v. State of California*, supra, is clearly distinguishable and does not require a different holding.

The District Court had jurisdiction pursuant to Sections 210(a) and 211(a) of the Economic Stabilization Act of 1970 as amended (ESA), 12 U.S.C. § 1904 note. We have appellate jurisdiction under Section 211(b)(2) of the ESA, 12 U.S.C. § 1904 note.

The motion of appellant Champlin Petroleum Company to dismiss for lack of subject matter jurisdiction is denied.