**SOUTH CENTRAL TERMINAL CO., INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF ENERGY, et al., Defendants.**

**Civ. A. No. 88–49 LON.**

United States District Court, D. Delaware.

Jan. 17, 1990.

Richard H. Morse, Young, Conaway, Stargatt & Taylor, Wilmington, Del. (David G. Wilson, of Andrews & Kurth, Washington, D.C., of counsel), for plaintiff.

Kent Jordan, U.S. Attys. Office, Wilmington, Del. (Don W. Crockett and Marc E. Kasischke, Office of Judicial Litigation, Economic Regulatory Admin., Washington, D.C., of counsel), for defendants.

LONGOBARDI, Chief Judge.

Plaintiff South Central Terminal Co., Inc. ("SCT"), formerly Bi–Petro Refining Co., Inc., is seeking judicial review of two Federal Energy Review Commission ("FERC") orders, one decided on May 7, 1986, *South Central Terminal, Inc.*, 35 FERC ¶ 61,173 (1986) (the "May 7 Order") and one decided on December 4, 1987, *South Central Terminal, Inc.*, 41 FERC ¶ 61,277 (1987) (the "December 4 Order"). The orders found that SCT violated the Department of Energy's ("DOE") Mandatory Petroleum Price Regulations ("MPPR"), 10 C.F.R. Part 212, by failing to file monthly cost allocation forms from July, 1978, through December, 1979, (the "audit period") for its product Leaded Straight Run ("LSR") and raising the price of the product during that period. The MPPRs require, *inter alia*, that all refiners of gasoline file monthly cost allocation forms with the DOE and prohibit those who fail to file the forms from increasing the price of their gasoline.

Both parties have moved for summary judgment claiming that no genuine issues of material fact exist and that they are entitled to judgment as a matter of law.

## I. FACTUAL BACKGROUND

In 1976 SCT purchased an oil refinery located in Pana, Illinois, and began producing three products, naphtha,[1] No. 2 diesel fuel and No. 6 residual fuel. At that time, none of these products were regulated by the MPPR.[2]

In 1978, SCT began production of the product LSR which was made by blending naphtha with lead and various hydrocarbon products. Sales of LSR commenced in July of 1978 at a price of $.3935 per gallon and continued through December, 1978, periodically increasing in price. DOE never received nor did SCT ever file any cost allocation forms for the period July, 1978, through December, 1979.

SCT sold 91% of its LSR during this period to ten customers. Record at 682. (Hereinafter reference to the administrative record will be denoted as "R. ____".) Of the ten customers, one sold LSR directly to the public as regular gasoline in exactly the same condition in which it had been received from SCT. R. 288.[3] In addition, SCT represented to three of the LSR customers that the product they were being sold was regular gasoline. R. 403, R. 387, R. 289.[4] At least five of the customers, however, testified that SCT had informed them that the LSR had to be blended with a higher octane gasoline in order to make it suitable for sale and at least seven customers did, in fact, blend the LSR before final sale. R. 318, R. 339, R. 387, R. 471, R. 529.

## II. REGULATORY BACKGROUND

At issue in this case is whether the sale by SCT of LSR violated the Mandatory Petroleum Price Regulations. 10 C.F.R. § 212. The MPPRs were promulgated under the Economic Stabilization Act of 1970 ("ESA"), 12 U.S.C. § 1904 note, and the Emergency Petroleum Allocation Act of 1973 ("EPAA"), 15 U.S.C. § 751 et seq., at a time when the United States was experiencing significant shortages in petroleum resources. The EPAA authorized the President to establish programs for the allocation of petroleum products and for regulation of their prices.

The MPPRs provide, in pertinent part, that "refiners [of] ... covered products" are required to "prepare and file with the [Federal Energy Administration] FEA periodic reports in accordance with forms and instructions issued by FEA."[5] 10 C.F.R. § 212.126(b), 39 Fed.Reg. 1924 (Jan. 15, 1974). "Covered products" are defined by the MPPRs as: "... aviation fuel (kerosene type), aviation gasoline, butane, crude oil, *gasoline*, natural gas liquids, natural gasoline, and propane. A blend of two or

---

1. The precise definition of "naphtha" is an issue in this case. Generally, naphtha is a by-product of refined crude petroleum.

2. A more complete discussion of the background of the Mandatory Petroleum Price Regulations is set out below.

3. Hearing Officer: Did they ever tell you that the material they were selling, had to be blended with other stuff before it could be burned in—before it could be used in automobiles?
   Witness: No.
   Hearing Officer: Did you ever blend it with anything? Did you ever add anything to the gasoline?
   Witness: No. Uh-huh.
   Hearing Officer: Okay. It was sold directly as [SCT] sold it to you?
   Witness: Right.
   Transcript of Economic Regulatory Administration ("ERA") Interview of Thomas Scott Ingles. R. 288–289. It should be noted that these interviews took place after the ERA issued SCT a Notice of Probable Violation and that they were *ex parte* investigatory interviews in which SCT did not participate.

4. Mr. Emmerson: Did you add anything to it at all to make it—to change the quality of the gasoline other than just mixing it with other motor gasoline?
   Mr. Molo: Well, not to begin with, no.
   Mr. Driscoll: Originally, no, because we were led to believe it was regular gasoline and, therefore, we put it into the bulk plant the same way as we would gasoline from our other suppliers.

5. 10 C.F.R. § 212.126(b) states:
   (b) Refiners, retailers, and resellers.
   Each firm which refines covered products and each firm which derives $50 million or more in annual sales or revenues from the retailing or reselling of covered products shall prepare and file with the FEA periodic reports in accordance with forms and instructions issued by FEA. Each refiner shall submit its calculations under the formulas of § 212.83 in accordance with forms and instructions issued by FEA.

more covered products is considered to be that particular covered product constituting the major proportion of the blend." 10 C.F.R. § 212.31, 43 Fed.Reg. 24265 (Jun. 5, 1978) (emphasis added). The same section of the regulations define gasoline as: "... all various grades other than aviation gasoline, of refined petroleum naphtha which, by its composition, is suitable for use as a carburant in internal combustion engines." 10 C.F.R. § 212.31, 40 Fed.Reg. 2795 (Jan. 16, 1975).

Pursuant to the MPPRs, a refiner of a covered product who fails to file periodic reports is prohibited from increasing the price of the covered product until it complies with the regulations. 10 C.F.R. § 212.130.[6]

## III. ADMINISTRATIVE BACKGROUND

On September 26, 1980, the Economic Regulatory Administration ("ERA"), the enforcement arm of the DOE, issued to SCT a Notice of Probable Violation ("NPV") in which it asserted that because LSR was a "covered product" under the MPPR, SCT's failure to file Form EIA–14 prohibited it from increasing the price of LSR. Consequently, it asserted that LSR price increases which resulted in revenues of $4,365,386.86 were illegal. Thus, SCT was claimed to have violated 10 C.F.R. § 212.126(b) and 10 C.F.R. § 130(a)(1).

SCT responded to the NPV on October 29, 1980, by stating that LSR was not gasoline or any other covered product. That it was, in fact, deregulated naphtha. Further, SCT asserted that the sanctions imposed by the NPV were invalid and that the NPV violated SCT's due process rights because it failed to specify adequately the precise nature of the charges against SCT.

Despite SCT's reply, ERA issued a Proposed Remedial Order ("PRO") on March 17, 1983, in which it made findings of fact that concluded, among other things, that: (1) LSR was a refined petroleum product suitable for use in internal combustion engines; (2) LSR was gasoline and a covered product; (3) LSR was not naphtha; (4) during the audit period SCT was a refiner and sold covered products; (5) SCT never filed any copies of Form EIA–14; and (6) during the audit period SCT increased its selling price of LSR by at least $4,365,386.86. The PRO concluded, as a matter of law, that: (1) LSR was at all times during the audit period a "covered product" as defined by 10 C.F.R. § 212.31; (2) during the audit period, SCT was a "refiner" as defined by 10 C.F.R. § 121.31; (3) during the audit period, SCT unlawfully increased its selling price of LSR by $4,365,386.86.

The proposed remedial action was the repayment of the $4,365,386.86 plus accrued interest. The PRO did not designate to whom the payment was to be made, leaving that issue to be determined by the Final Remedial Order.

SCT appealed the PRO to the Department of Energy's Office of Hearing and Appeals ("OHA") with full briefing and oral argument. The two primary issues on appeal were whether LSR was "gasoline" as defined by the MPPR and whether the amount of the refund was correct.

On the issue of whether LSR was "gasoline", the OHA held an evidentiary hearing to determine whether LSR was suitable as a carburant in an internal combustion engine. Both SCT and the ERA produced experts that testified to the inherent qualities of LSR. While the SCT expert, Mr. Edward C. Squire, testified extensively that LSR did not fall within any of the technical specifications of gasoline annunciated by the American Society for Testing and Mate-

---

6. 10 C.F.R. § 130 states:
(a) If a firm which is required to file a report or other document with the Federal Energy Administration pursuant to the provisions of this part or any order issued by the Federal Energy Administration does not, within the time limits prescribed, file the report or other document—

(1) The firm may not implement any further price increases including increases which could otherwise be implemented [under the regulations] until it has complied with that reporting requirement and has obtained the special approval of the Federal Energy Administration.

rials ("ASTM"),[7] he did not state that LSR was unsuitable for use as a carburant in an internal combustion engine. In fact, with respect to one sample of LSR,[8] Mr. Squire testified that it would "do a reasonably good job" operating almost all cars on the road. R. 1181. Further, when asked "I take it your testimony is that this [LSR] is not a good quality gasoline?", Mr. Squire answered, "That is my testimony." R. 1213.

ERA's expert, Mr. Richard W. Hurn, discussed specific qualities which would make a material suitable as a carburant in an internal combustion engine. Among the several factors discussed, Mr. Hurn stated that the principle characteristics of suitability were octane number[9] and RVP.[10]

With respect to octane number, Mr. Hurn testified that of the LSR samples from which octane numbers had been derived, most were high enough to allow them to perform suitably in many internal combustion engines.[11]

In terms of volatility, Mr. Hurn testified that a fuel is a suitable carburant if it has an RVP between 6 and 20. R. 1227. Mr. Hurn further stated that all of the samples of LSR sold by SCT during the audit period had a RVP within this range.

On the basis of the evidentiary hearing, the oral argument and voluminous briefing by both sides, OHA issued its final Remedial Order ("RO") on April 5, 1985. In the RO, OHA reissued the findings and conclusions of the PRO as the final Remedial Order with the additional requirement that the overcharges plus interest be paid to DOE pending the filing of a Petition for Implementation of Special Refund Procedures by the ERA.

SCT appealed the RO to the Federal Energy Regulatory Commission ("FERC"). The Administrative Law Judge ("ALJ") assigned to the appeal, unaware that a request for oral argument pursuant to DOE regulations had been filed by SCT, certified the record for review by the FERC. When the ALJ became aware of the request, she

7. ASTM, founded in 1898, is a scientific and technical organization that develops standards on the characteristics and performance of materials, products, systems and services. ASTM standards are comprised of, among other things, definitions and specifications. These are compiled each year and published in the Annual Book of ASTM standards.

With respect to gasoline, ASTM has both a definition for gasoline and specifications for automotive gasoline. The *definition* for gasoline, ASTM D 228–61, which is very similar to the MPPR definition for gasoline, reads as follows: "Gasoline—a refined petroleum naphtha which, by its composition, is suitable for use as a carburant in internal combustion engines."

The ASTM *specifications* for automotive gasoline, set forth in ASTM D 439 are intended to provide "guidance in establishing the required properties of automotive gasoline for grand vehicles." ASTM 439 at 224. The specifications state expressly, that *"these specifications are not a complete definition of gasoline."* (Emphasis added.)

8. Because no traces of the LSR that was sold during the audit period remained at the time of the evidentiary hearing, the evidence used was obtained from thirty-three tests performed on SCT products by the Chemical Division of the E.I. duPont de Nemours & Co. both during and after the audit period.

It should be noted that the ERA objected to the admissibility of a number of the test results for several reasons. First, ERA objected to the

test samples taken from SCT's blending tanks because no sales were made from the blending tanks. Second, ERA objected to the samples taken after the audit period because they were irrelevant. The OHA, however, in light of the scarcity of evidence, admitted all of the exhibits for the limited purpose of gaining insight in the general nature of the product.

9. Octane number measures the extent to which a fuel will cause engine "knock." Sustained knocking will cause damage to an internal combustion engine.

10. RVP stands for Reid Vapor Pressure and is the measure of the volatility of a fuel. RVP actually measures the degree to which a material can make the necessary change from liquid to vapor in the induction system of an internal combustion engine.

11. Q: With regard to these samples that tell you just the octane numbers, can you make a judgment as to whether or not they would provide satisfactory operation under a range of conditions?

A: The judgment derives from the numbers that I just cited, and it would appear that the octane levels that are indicated by the data fall within the general range of values which provide freedom from customer objection for a very large fraction of automobiles in which leaded product would be used.
R. 1237.

withdrew her certification of the record and scheduled oral argument. SCT, believing that the ALJ was prejudiced against its case, filed a motion for the designation of a new ALJ. FERC denied the motion.

The principal issue at the oral argument was the legislative history of the MPPR definition of gasoline. SCT asserted that, despite its language, the definition did not, in fact, include all materials suitable as carburants in internal combustion engines but, rather, the definition incorporated the technical ASTM specifications for gasoline. In support of this position, SCT traced the MPPR definition of gasoline back to the definition promulgated by the Cost of Living Council in 1970 which, SCT believes, incorporated the ASTM specifications for automotive gasoline. Through a series of speculative assertions, SCT contended that despite incorporation of the definition by a different agency and subsequent amendment of the language of the definition the definition still incorporates the ASTM specifications of gasoline.

In the May 7 Order styled "Partial Affirmance and Remand", FERC affirmed the RO as to the violations and the method for calculating interest but remanded the issue of the principal amount of the refund. The FERC remanded because the RO affirmed the proposed remedy without modification believing, incorrectly, that SCT had continued to withhold the filing of the forms. In fact, SCT had submitted the EIA–14 forms in the appendix to one of its briefs objecting to the RO.

Both parties briefed their positions on remand and the ERA, in its prosecutorial discretion agreed not to dispute the results of SCT's calculation of its refund liability. SCT's calculations were based on the amount by which SCT actually charged in excess of what it would have been allowed to charge had it filed the required forms. In other words, SCT did not include in its calculation of liability the revenue derived from price increases it made on LSR which would have been allowed had it filed its EIA–14s but were prohibited because of its failure to do so. On April 30, 1987, the OHA issued a Supplemental Order modifying the RO to provide that SCT refund $236,242 plus interest. OHA specifically stated that its determination of the amount of the refund was based solely on ERA's acquiescence to SCT's calculations.[12]

SCT appealed the amount of interest calculated under the April 30 Supplemental Order and OHA subsequently issued a second Supplemental Order on June 11, 1987, modifying the amount of interest owed by SCT.

SCT subsequently appealed both Supplemental Orders to the FERC. Its primary contention on appeal was that because the Supplemental Orders limited the refund to the five months in which SCT actually overcharged for LSR, SCT was only being charged with violations during those five months. While the May 7 Order found that LSR was gasoline during the eighteen month audit period, it did not specifically find that LSR was gasoline during the five months in which SCT overcharged for the product. Thus, SCT claimed, the evidence did not support the conclusion that LSR was, in fact, gasoline during those months.

In its brief on appeal, SCT moved to add new facts concerning the nature of LSR during the five months of overcharges. The motion was denied by the ALJ because SCT had had ample opportunity to raise these facts in the proceedings below.[13]

---

12. OHA stated:

In [reducing the refund] ... we stress that this determination is based solely on ERA's decision to acquiesce in South Central's revised calculations. We believe that the analysis of 10 C.F.R. §§ 212.126(b) and 212.-130(a)(1) set forth in [the Remedial Order], and apparently supported by the Commission, to be correct. The ERA therefore could have sought to obtain the return of the entire amount by which [SCT] improperly increased

its prices. June 13, 1986, Supplemental Order.

R. 2275.

13. The Order states:

I deny South Central's request to raise new facts because it had ample opportunity to put this evidence into the record at the evidentiary hearing held on June 15, 1984. The issue of whether the products it sold came within the applicable definition of gasoline has always been a key factual issue in this proceed-

SCT also requested an oral argument in support of its position that LSR was not gasoline during the five months of overcharges. On October 22, 1987, the ALJ denied the motion.[14] Immediately thereafter, SCT moved to permit interlocutory appeal to the FERC of the order denying oral argument. On November 4, 1987, the ALJ denied the motion.

On November 6, 1987, the ALJ certified the record for review by the FERC. On November 13, 1987, SCT appealed to the FERC the ALJ orders denying its request to raise new facts and denying oral argument and asserted that the ALJ had certified an incomplete record. On December 4, 1987, the FERC issued a final order (the "December 7 Order") affirming the RO as modified by the two Supplemental Orders without addressing the issues raised in SCT's appeal. On December 28, 1987, SCT moved the FERC for reconsideration of the order affirming the modified RO. On April 29, 1988, the Chief Administrative Law Judge supplemented the certified record to make it complete. The FERC thereafter denied the motion for reconsideration. However, in its order, FERC addressed each of the issues SCT raised on appeal and stated that its affirmance of the modified RO was based on the record as supplemented on April 29, 1988, by the Chief Administrative Law Judge.

At present, SCT seeks judicial review of both the May 7, 1986, Order affirming and remanding the OHA, RO and the December 4, 1987, Order affirming the RO as modified by the two Supplemental Orders.

## IV. DISCUSSION

### A. *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment will be rendered for a moving party if that party is successful in showing that there exists no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The present case is appropriate for summary judgment because there are no factual disputes. Review of an FERC determination requires an examination by the Court of the evidence presented to the agency in the first instance and contained in the certified agency record. The court may not look at facts outside the record in its review of the administrative decision. *F.P.C. v. Transcontinental Gas Pipe Line Corp.,* 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976); *Department of Energy v. Osborn,* 760 F.2d 282, 283 (Temp.Emer.Ct.App. 1984). The only factual dispute appropriate for this Court then would be one concerning the contents of the certified record. There being no such dispute, the duty of this Court then is to determine which party is entitled to judgment as a matter of law. In this case, such a determination requires an inquiry into the validity of each of the Plaintiff's claims of the inadequacy of the May 7, 1986, and December 4, 1987, Orders.

### B. *Standards of Review*

■ The scope of review to be exercised by this Court is limited. *Thriftway Co. v. U.S. Dept. of Energy,* 867 F.2d 1577, 1580 (Temp.Emer.Ct.App.1989); *City of Long Beach v. Department of Energy,* 754 F.2d 379, 385 (Temp.Emer.Ct.App.1985). For challenges to FERC final decisions, the standard of review that this Court must apply is found in the Economic Stabilization Act of 1970 at § 211(d)(1), 12 U.S.C. § 1904 note, as incorporated by the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a). It states: "No order of such agency shall be enjoined or set aside, in

---

ing. Contrary to its claim, the revisions to the Remedial Order only address the principal amount of the refund.
R. 2317.

**14.** The Order states:
The sole matter on remand was the principal amount of the refund. In all other respects, the Department's Remedial Order was affirmed. I deny South Central's request for a hearing because it is requesting oral argument to relitigate a factual issue on which the Commission has determined the Remedial Order issued April 5, 1985 is correct.
R. 2506.

whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note at § 211(d)(1). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). As long as there is substantial evidence in the record to support the findings upon which the agency's decision is based, this Court must affirm the agency decision even if suggested alternative conclusions may be equally or even more reasonable and persuasive. *Mr. Magic Car Wash v. Department of Energy*, 596 F.2d 1023, 1028 (Temp.Emer.Ct.App.1978).

For challenges to an agency's interpretation of its own regulations, the standard of review is to afford great deference to the agency's interpretation. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The rationale for the deference is the recognized administrative expertise of an agency decision-maker and the difficulty of judicial administration of complex programs dealing with the petroleum industry. *Thriftway*, 867 F.2d at 1580; *City of Long Beach*, 754 F.2d at 386. The standard, however, is not absolute deference. An agency's determination should not be afforded deference where it is plainly erroneous or inconsistent with the regulations. *Udall*, 380 U.S. at 16–17, 85 S.Ct. at 801–02; *Grigsby v. Department of Energy*, 585 F.2d 1069 (Temp.Emer.Ct.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979).

## C. *Analysis of Plaintiff's Claims*

Plaintiff makes a number of assertions which, if correct, would require this Court to set aside the FERC orders. First, it claims that DOE misinterpreted the filing requirements under the MPPRs. Even if LSR did fall within the MPPR definition of gasoline, SCT was not required to file any forms under the regulations. Second, SCT claims that DOE's interpretation of the def-

inition of gasoline in the MPPRs is plainly erroneous. Third, if DOE's interpretation is not erroneous, then the definition is impermissibly vague. Fourth, the December 7, 1987, Order affirming the modified Remedial ·Order is not based on substantial evidence. Fifth, the December 7, 1987, Order denies SCT due process. Applying the appropriate standards of review, the Court will address these claims seriatim.

1. Plaintiff's First Claim: The Instructions to Form EIA–14 Did Not Require SCT to File the Form

■ SCT's first claim is that it did not violate the filing requirement of the MPPR because it was not required to do so by the instructions to the form it was supposed to have filed. Because SCT was not required to file any forms, it was not prohibited from raising the price of LSR during the audit period.

The filing requirement in question, 10 C.F.R. § 212.126(b), states that refiners of covered products are required to prepare and file periodic reports "in accordance with forms and instructions issued by the FEA [predecessor to the DOE]." 10 C.F.R. 121.126(b).[15] The form in question is Form EIA–14, Refiner's Monthly Cost Allocation Report. DOE asserts that SCT was required to enter information about their product, LSR, in Part VII: Summary of Volumetric Elements on line 70(2) of the form entitled "Regular Gasoline." The instructions to line 70(2) state: "Leaded regular, as defined in ASTM D–439–75, is gasoline antiknock designation 3, produced with the use of any lead additives, or those that contain more than 0.05 gram of lead per gallon, or more than 0.0005 gram of phosphorus." R. 631. SCT asserts that the instructions, as stated, do not require the entry of information regarding LSR.

Because the filing regulation imposes the requirement to file periodic statements in accordance with the forms and instructions issued by the DOE and the instructions to Form EIA–14 do not require the entry of information about LSR, SCT contends it

15. *See* note 5, *supra*.

could not have violated the filing regulation.

The May 7, 1986, Order concludes that SCT violated the filing requirements located in 10 C.F.R. § 212.126(b). R. 2261. SCT's claim, therefore, is that in so finding, FERC misinterpreted the requirements of the filing regulation. This Court's review, then, is limited to a determination of whether FERC's interpretation of its own regulation is plainly erroneous. *Udall,* 380 U.S. 1, 85 S.Ct. 792.

While it is true that the instructions to Section VII, item 70(2) of Form EIA–14 do make reference to the ASTM specifications for gasoline, the Court does not find FERC's interpretation of the MPPR filing requirement to be plainly erroneous.

The instructions to Form EIA–14 are divided into 4 areas which are headed General Information, General Instructions, Definitions and Specific Instructions. R. 618–635. There is no definition of gasoline in the Definitions section of the instructions. The only reference to the ASTM specifications appears in the Specific Instructions section. R. 631. Thus, the instructions to Form EIA–14 do not purport to provide a "definition" for gasoline.

Further, as an introductory note to the Specific Instructions section in which the ASTM reference is made, the instructions state:

> The definitions included in the instructions below reflect provisions of Parts 211 and 212 of the Mandatory Petroleum Price Regulations as of December 1, 1979. However, any attachments to the regulations implemented after this date should be taken into account. *In addition, should differences arise between the provisions of the regulations and the definitions set forth below, the regulations shall be controlling.*

R. 624 (emphasis added).

Thus, the instructions themselves state that where a conflict arises between the regulations and the instructions, the regulations prevail.

SCT contends in its brief that this provision only provides for differences between the instructions and amendments to the regulations made subsequent to the issuance of Form EIA–14. In support of this construction, SCT asserts that because the provision speaks of "attachments to the regulations after this date" and differences that "arise", the only possible construction is one that contemplates differences between the instructions and newly amended regulations.

SCT fails to note, however, that between the two phrases it cites there appears both a period, indicating the end of a sentence, and the phrase "In addition." The insertion of these into the provision indicates that the sentence discussing differences that "arise" is meant to be wholly separated from the sentence referring to "attachments to the regulations." This Court is persuaded that the provision anticipates differences arising between existing regulations and the instructions to the forms and provides that the regulations control in such instances.

Given this construction of the provision, SCT claims that it is not applicable because there is no inconsistency between the requirements of section 212.126(b) and the instructions to Form EIA–14. SCT asserts that it was only required under the regulation to report what information was requested on the form.

Section 212.126(b) requires the filing of periodic reports by refiners of covered products in accordance with DOE instructions. The inconsistency in the regulation is that the term "covered products" in the first sentence contemplates the inclusion of LSR as a product for which periodic reports must be filed and the instructions to Form EIA–14 arguably do not. In the face of such an inconsistency, SCT was obligated to adhere to the regulations which required the filing of periodic reports with respect to covered products.

Thus it was not plainly erroneous for FERC to have interpreted the MPPR filing requirement to be applicable to SCT in the present situation.

2. Plaintiff's Second Claim: The DOE Interpretation of Gasoline is Plainly Erroneous

■ SCT argues that the May 7, 1986, Order should be set aside because the in-

clusion of LSR as a "covered product" is based on a plainly erroneous interpretation of "gasoline" by the DOE. The essence of SCT's argument is that the MPPR definition of gasoline found at 10 C.F.R. § 212.31 does not mean what it says.

In 1975 the language of the MPPR definition of gasoline was amended to read: "Gasoline means all various grades other than aviation gasoline, of refined petroleum naphtha which, by its composition, is suitable for use as a carburant in internal combustion engines." 10 C.F.R. § 212.31. This language is almost identical to the ASTM definition of gasoline which reads: "Gasoline—a refined petroleum naphtha which, by its composition, is suitable for use as a carburant in internal combustion engines." ASTM D 288–61 (Reapproved 1968). SCT concedes that LSR falls within the ASTM definition of gasoline but denies that it falls within the MPPR definition. It argues that the MPPR definition, despite its language, has a much narrower interpretation consisting of that which comports to the ASTM specifications of gasoline. SCT asserts that DOE erred in adopting the broad interpretation consistent with the language of the regulation.

As stated above, it is the duty of this Court to afford great deference to an administrative agency's interpretation of its own regulations. *Udall*, 380 U.S. at 16, 85 S.Ct. at 801.

> When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order. "Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–414 [65 S.Ct. 1215, 1217, 89 L.Ed. 1700].

*Id.* at 16–17, 85 S.Ct. at 801. In reviewing the DOE interpretation then, unless there is plain error, this Court will defer to the agency's interpretation. *Tenneco Oil Co. v. Federal Energy Administration*, 613 F.2d 298, 302 (Temp.Emer.Ct.App.1979); *Grigsby v. Department of Energy*, 585 F.2d 1069 (Temp.Emer.Ct.App.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979). In applying this standard, the relevant inquiry is whether the agency interpretation is arbitrary or capricious. *Grigsby*, 585 F.2d at 1075.

SCT uses three arguments to prove the erroneous nature of DOE's interpretation of its own regulation. In its first argument, SCT asserts that the present MPPR definition of gasoline is derived from the definition of gasoline utilized in the Cost of Living Council's ("CLC") Phase IV Petroleum Price Regulations. 6 C.F.R. Part 150, Subpart L (1974).[16] SCT asserts and DOE agrees that although the language of the definition was amended in 1975, its meaning has not substantially changed. SCT argues that the CLC definition incorporated the ASTM specifications for gasoline. If the CLC definition of gasoline incorporated the ASTM specification then, SCT asserts, the MPPR definition must also incorporate the specifications.

The CLC definition does not refer to the ASTM specifications. SCT argues, however, that an analysis of the legislative history of the regulations and the forms issued pursuant to it indicate that the ASTM specifications were incorporated.

The May 7, 1986, Order addressed this assertion by correctly pointing out the speculative nature of SCT's argument and emphasizing its lack of support. The Order further pointed out that the two other products defined by the CLC regulations, No. 2–D diesel fuel and No. 2 heating oil, expressly incorporated ASTM specifications. The express incorporation of ASTM specifications in the definitions of two of the three products defined by the CLC regulations and the noticeable absence of the

---

**16.** CLC Phase IV Petroleum Price Regulations state: "Gasoline means any of the various grades of retail gasoline other than aviation gasoline." 6 C.F.R. Part 150, Subpart L (1974).

ASTM specifications from the third definition argue against its incorporation.

SCT argues that the omission of the ASTM specifications from the CLC definition of gasoline was an "oversight" which was corrected by the forms and instructions issued pursuant to the regulations. Yet, SCT points to no acknowledgment by the CLC that the forms and instructions were correcting any deficiencies in the regulations.

Given the above reasoning applied by FERC, it was neither arbitrary, capricious nor plain error for the FERC to find that the ASTM specifications of gasoline were not incorporated into the CLC definition of gasoline.

SCT's second argument alleging error in DOE's interpretation of the MPPR definition of gasoline centers on the instructions and forms issued pursuant to the regulations. In an argument similar to SCT's initial argument, SCT asserts that because 10 C.F.R. § 121.126(b) and its predecessor regulation under the CLC regulations required that information be reported in accordance with forms and instructions issued by the DOE or the FEA, the forms and instructions were automatically incorporated into the regulations. Consequently, the references in those instructions to the ASTM specifications of gasoline were also incorporated into the regulations and, in fact, became the definition of gasoline utilized by the regulations.

Again, it is important to note that the instructions to the forms issued pursuant to 10 C.F.R. § 212.126(b) carry with them a provision instructing the filer to follow the regulations when inconsistencies arise between the instructions and the regulations. SCT's position, however, is that there is no inconsistency between the instructions and the regulations. The Court disagrees.

DOE, in its RO, affirmed by the May 7, 1896, Order, pointed out that the definition of gasoline "in effect during the audit period was intended to include the widest possible category of products, rather than only those which met some particular set of industry specifications." R. 18. In coming to its conclusion, OHA relied upon the leg-

islative history of both the EPAA and the MPPR definition of gasoline itself. The Preamble to the 1975 amendment which altered the language of the MPPR definition of gasoline to its present form states that "Congress intended to provide for the regulation of a broader range of petroleum products than those that meet the technical specifications of the products enumerated by the [Emergency Petroleum Allocation] Act." 40 Fed.Reg. at 2795.

The legislative history in addition to the plain language of the MPPR definition points to a broad interpretation of the definition of gasoline. The instructions to the forms arguably point to a narrower definition of gasoline. Thus, there is an inconsistency between the regulations and the instructions. That inconsistency, however, must necessarily be resolved in favor of the regulations. In light of the forgoing, it was not plainly erroneous for the FERC to disregard the ASTM references in the instructions in making its decision about the interpretation of gasoline.

Finally, SCT argues that review of other definitions of products within the MPPRs and other regulations promulgated pursuant to the EPAA prove the erroneous nature of the FERC interpretation of the definition of gasoline. In support of its position, SCT puts forth three arguments. First, it compares the definition of "motor gasoline" in the Mandatory Petroleum Allocation Regulations, 10 C.F.R. § 211.51, 39 Fed.Reg. 1924, 1938 (Jan. 15, 1974) with the MPPR definition of "gasoline." SCT argues that the definitions are coextensive and, because the definition of motor gasoline does not include LSR, the MPPR definition, therefore, could not include LSR. Next, SCT asserts that an analysis of the MPPR definitions of "naphtha" and "special naphtha", 10 C.F.R. § 212.31, 40 Fed. Reg. 2795 (Jan. 16, 1975), proves that the MPPR definition of gasoline is limited to the ASTM specifications. Finally, SCT compares the ASTM definition of gasoline with the MPPR definition and concludes that the MPPR definition is limited to the ASTM specifications.

All three of SCT's arguments are unsupported, speculative and desperate assertions which fail to persuade the Court. At the very least, different conclusions could be drawn from the arguments and, as such, they do not support SCT's assertion of plain error in the FERC interpretation.

For the reasons stated above, the Court finds that the FERC did not commit plain error in giving a broad interpretation to the MPPR definition of gasoline.

### 3. Plaintiff's Third Claim: The Findings of the FERC Are Not Supported by Substantial Evidence

■ Having determined that the FERC definition of gasoline is not clearly erroneous, the Court next addresses the assertion that the FERC findings of SCT's violation of 10 C.F.R. § 212.126(b) and 10 C.F.R. § 212.130(a)(1) are not supported by substantial evidence. The heart of SCT's claim is that the administrative record lacks the requisite substantial evidence to support FERC's finding that LSR was gasoline as defined by 10 C.F.R. § 212.31.

As stated above, an order of the DOE will be set aside if it is based upon findings which are not supported by substantial evidence. *Exxon Corp. v. Department of Energy,* 802 F.2d 1400, 1406 (Temp.Emer.Ct. App.1986). In determining whether "substantial evidence" exists, the relevant inquiry is whether there exists in the administrative record "such ... evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. at 1427.

The FERC in its May 7, 1986, Order cited to considerable evidence in the record to support the finding that LSR was gasoline. The FERC stated:

What is persuasive here is that the unrefuted evidence shows this product to be within the definition of gasoline at 10 C.F.R. § 212.31, *i.e.,* "refined petroleum naphtha ... suitable for use as a carburant in internal combustion engines." The unrefuted evidence is as follows: South Central's product had an octane rating of at least 83.6; over most of the audit period South Central, in offering it

for sale, called the product "gasoline" or "leaded regular"; South Central's invoices showed "Fed. Motor Fuel Reg. No." and "State Motor Fuel Lic. No." for the product; those who purchased it were in the business of selling gasoline at retail; sales occurred during a period of gasoline shortages; South Central's price was similar to the wholesale price of gasoline; the purchasers needed gasoline and called what they bought from South Central gasoline; at least two purchasers sold it directly as purchased from South Central and some put their purchases of LSR into tanks in which they had higher octane gasoline; the purchasers, including the ones who sold it directly, had few if any complaints from their retail customers; the purchasers paid state and federal motor fuel taxes when they resold the product; and a company which transported the product described the product as gasoline on an application apparently submitted to the Interstate Commerce Commission.

FERC Oral Argument at 6–9 [R. 2114–2117], 37–38 [R. 2145–2146], 75 [R. 2183], Exhibit G at 29–30, Exhibit D; statement of Thomas Scott Ingles at 5–14 [R. 282–291], 19–20 [R. 296–297], 22–23 [R. 299–300]; statement of William Knapp at 10–15 [R. 316–321], 17–19 [R. 323–325] and exhibits; statements of Donald Lamberti and Howard Goetz at 6–10 [R. 339–343] and exhibits; statement of Gene Allen Warmann at 5–6 [R. 382–383]; statement of Robert E. Molo and Judd Driscoll at 6–16 [R. 398–408], 19–21 [R. 411–413] and exhibits; statement of Loren W. Proefrock at 7–9 [R. 469–471] statement of James Reese at 8–9 [R. 489–490], 21 [R. 502], 23 [R. 504] and exhibits; statement of Ned Riggins at 5 [R. 522], 8–10; Statement of Gene Allen Warmann at 5–14.

In addition to the evidence mentioned above, FERC held an evidentiary hearing the purpose of which was to determine whether LSR was suitable as a carburant in an internal combustion engine. SCT's expert testified that the average octane number for LSR sold during the audit period was 85.3. R. 1195. He further testified

that of the 32 million cars on the road in 1979, 23 million would run satisfactorily on a fuel of 85 octane. R. 1194. DOE's expert testified that "the general category of product that is described here [LSR] will operate an engine, or engines of the general nature found in the car population, and there will be a very large fraction of the consuming public that will never know the difference." R. 1259.

The Court finds the preceding evidence substantial enough to support the FERC finding that LSR was gasoline as defined by the MPPRs during the audit period.

SCT argues, however, that the relevant question is not whether LSR was gasoline during the audit period but rather whether LSR was gasoline during the five months in which SCT determined that it overcharged for LSR.

When FERC affirmed the findings of the RO on the issue of liability, it remanded to OHA the issue of the amount of refund owed by SCT. ERA, in its prosecutorial discretion, did not contest SCT's calculation of the refund. SCT's refund was limited to the overcharges in the five months that LSR's price was in excess of what SCT could have charged if it had filed its Form EIA–14s. SCT now argues that because it was only liable for overcharges in five months out of the audit period, the relevant question on appeal is whether LSR was, in fact, gasoline during those five months.

The Court disagrees. The issue of whether LSR was gasoline during the entire audit period was determined by FERC in the May 7, 1986, Order and that finding, as discussed above, was supported by substantial evidence. The only issue that was remanded was the amount of the refund owed by SCT. ERA acquiesced to SCT calculations of its refund and now SCT is attempting to bootstrap itself out of liability by relying on its own uncontested calculations of the refund. OHA stated in its first Supplemental RO that despite ERA's acquiescence to SCT's calculations to the refund, SCT was liable for violations during the entire audit period and ERA "could therefore have sought to obtain the return of the entire amount by which [SCT] im-

properly increased its prices." R. 2275. SCT's argument is without merit and the Court finds that there is substantial evidence in the record to support FERC's findings that SCT violated 10 C.F.R. §§ 212.-126(b) and 212.130(a)(1).

4. Plaintiff's Fourth Claim: Constitutional Claims

SCT alleges two constitutional violations with respect to the FERC Orders. First, it claims that if the definition of gasoline is as FERC interprets it, then it is impermissibly vague. Second, SCT claims that its due process rights were violated at the administrative level.

Before addressing these issues the Court must first determine the standard of review for constitutional claims arising under the EPAA. Section five of the EPAA explicitly incorporates section 211(c) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, which provides that only the Temporary Emergency Court of Appeals ("TECA") may pass upon "substantial" constitutional questions arising from the operation of the EPAA or orders and regulations issued thereunder. Section 211(c) requires this Court, if it determines that there is a "substantial" constitutional question, to certify such question to the TECA. A constitutional question is not substantial if (1) it is plainly without merit, or (2) Supreme Court or TECA precedent clearly forecloses the issue raised. *Citronelle–Mobile Gathering, Inc. v. Gulf Oil*, 578 F.2d 1149, 1153 (Temp.Emer.Ct.App. 1978), *cert. denied*, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 108 (1979); *Atlantic Richfield Co. v. F.E.A.*, 429 F.Supp. 1052, 1061 (N.D.Cal.1976), *aff'd*, 556 F.2d 542 (5th Cir. 1977). The duty of this Court, therefore, with respect to SCT's constitutional claims is to determine whether they were substantial enough to certify to the TECA.

■ With respect to the vagueness argument, SCT asserts that if the definition of gasoline is as broad as FERC interprets it to be, then it is impermissibly vague. Chief among SCT's objections to the definition are the use of the terms "internal combustion engine" and "suitable for use."

The uncertainty of these terms, SCT asserts, renders the definition meaningless and unpredictable.

Courts have used several standards to determine whether a statute or regulation is void for vagueness depending upon the context in which the claim is asserted. The doctrine is most rigorously applied in the context of penal statutes, *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947), and in the area of first amendment rights. *Ryder Truck Lines, Inc. v. Brennan,* 497 F.2d 230, 233 (5th Cir.1974). A less stringent standard, however, is applied to commercial regulatory statutes. *Small Co. v. Am. Sugar Ref. Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925). In *Small,* a party to a contract dispute argued that the statute relied on by its opponent as a defense to the enforcement of the contract was void for vagueness. In assessing the vagueness of the statute, the court stated that a statute in this context would only be void if it were "so vague and indefinite as really to be no rule or standard at all." *Id.* at 239, 45 S.Ct. at 297. Uncertainty in the statute is not enough for it to be unconstitutionally vague, rather, it must be substantially incomprehensible. *Exxon Corp. v. Busbee,* 644 F.2d 1030, 1033 (5th Cir.), *cert. denied,* 454 U.S. 932, 102 S.Ct. 430, 70 L.Ed.2d 239 (1981) (holding that a section of the Georgia Gasoline Marketing Practices Act was not unconstitutionally vague).

Here, although there is some uncertainty about the limits of the definition of gasoline, the uncertainty does not rise to the level of incomprehensibility. Additionally, despite SCT's claim that the definition is incomprehensible, the Court has been unable to uncover any other complaints to its construction. Finally, had SCT been unable to comprehend the scope of the definition, it could have availed itself of the agency's provisions for seeking an interpretation of the regulation. 10 C.F.R. § 205(F). SCT's vagueness claim will not be certified to the TECA because it is plainly without merit.

SCT's second constitutional claim is that irregularities in the administrative proceedings below denied it due process. Although not articulated by SCT, its claim is in fact twofold. SCT asserts that any deviation by an administrative agency from its procedural rules is a violation of due process. Docket Item ("D.I.") 21 at 45. This is a misstatement of the law. While it is true that an agency is normally bound by its own rules, *Frisby v. U.S. Dept. of Housing & Urban Development,* 755 F.2d 1052, 1055 (3rd Cir.1985) and, under certain circumstances, administrative determinations can be set aside on the basis of violations of those rules, *Pfizer, Inc. v. Heckler,* 735 F.2d 1502, 1507 (D.C.Cir.1984), deviations therefrom do not automatically constitute violations of due process. SCT's two claims are: (1) that the FERC Orders should be set aside because of DOE's failure to abide by its own procedural rules; and (2) that the alleged procedural deviations were violations of due process.

With respect to SCT's first claim, because it is not constitutional in nature, this Court is not restrained in its review to a simple determination of substantiality.

SCT cites four instances where DOE allegedly deviated from it own procedural rules. First, in failing to allow SCT oral argument on its appeal of the two Supplemental Remedial Orders, DOE is alleged to have violated section 503(c) of the Department of Energy Organization Act, 42 U.S.C. § 7101, et seq., and the FERC procedural regulations governing remedial orders, 18 C.F.R. § 358.909(b) (1987). Section 503(c) states in pertinent part that after a party has been issued a remedial order, the FERC must grant the party's request for oral argument. 42 U.S.C. § 7193.[17] The FERC procedural regulations provide that "if a participant has filed a request for a hearing, the presiding officer will grant the request for a hearing." 10 C.F.R. § 358.909(b). SCT asserts that this right was absolute with respect to

---

17. 42 U.S.C. § 7193(c) states: "The Commission shall, upon request, afford an opportunity for a hearing, including, at minimum, the submission of briefs, oral or documentary evidence, and oral argument."

their appeal to the Supplemental Remedial Orders and that DOE's failure to allow argument should result in the FERC Orders being set aside.

FERC, in its June 3, 1988, Order Denying Reconsideration addressed this issue. It stated:

> However, as already noted, the liability issue concerning which South Central now seeks a hearing was the subject of a prior hearing for oral argument at the Commission, and was resolved dispositively against South Central in the Commission's May 7, 1986 order. Neither the DOE Act, nor the Commission's procedural rules entitled South Central to a second hearing on an issue already resolved by the Commission. The Commission therefore finds no procedural error in the Administrative Law Judge's denial of the South Central's motion for a hearing. . . .

R. 2569.

Because this is an interpretation by the FERC of its own regulations, the Court must afford this interpretation great deference unless it is plainly erroneous. *Grigsby*, 585 F.2d 1069. In its review of the DOE Act and the FERC regulations, the Court does not find plain error in the FERC interpretation of the statute and regulations. Further, SCT points to no authorities which question or contradict the FERC determination that a party is not entitled, under the statute and regulations, to two hearings on the same issue. Thus, SCT's first allegation of procedural violation is without merit and cannot be the basis for setting aside the FERC Orders.

SCT next asserts that same regulations and statutes cited above automatically afforded SCT the right to brief the issues that would have been raised in the oral argument. Because SCT never attempted to submit briefs on these issues and because there was never an administrative determination that SCT was not allowed to do so, the Court is curious where the alleged procedural violation lies.

SCT further asserts that when the ALJ of the FERC denied its motion to raise new facts after the Supplemental ROs were issued, FERC again violated its own procedural rules. Rule 907 of the FERC procedural rules states that permission to raise new facts will only be granted when the new facts:

> (1)(i) Are facts or issues that were not known and could not, with the exercise of due care, have been known to the petitioner at the time they would otherwise have been raise during the prior proceedings;
>
> (ii) Are facts or issues that the petitioner was unable to raise at the time they could have been raised during the prior proceeding because of unduly restrictive time limits imposed by the Secretary; or
>
> (iii) Are facts or issues that the petitioner was not permitted to raise in the prior proceedings due to erroneous adverse procedural rulings; and
>
> (iv) Are necessary for a full and true disclosure of the facts.

18 C.F.R. § 385.907(a). In ruling on this issue in its June 3, 1988, Order Denying Reconsideration, FERC expressly upheld the findings of the ALJ who denied the motion. The ALJ stated:

> (1) South Central knew the facts and issues at the time of the earlier evidentiary hearing and had an opportunity then to present this evidence, (2) the Secretary [of Energy] did not impose unduly restrictive time limits [on South Central's challenges to the DOE enforcement documents], (3) there was no adverse procedural ruling [by OHA] that prevented the earlier introduction in evidence of this material, and (4) the information is not necessary because this Commission has rejected South Central's position that the product it sold was not gasoline within the meaning to the applicable regulations.

R. 2317. In upholding the ALJ's determination, the FERC emphasized that the only issue remanded was the amount of the refund. The liability issue had already been affirmed by the FERC. Therefore, it was not necessary, nor would it have been proper for the ALJ to allow the introduc-

tion of new facts on the liability issue. R. 2568.

■ Our review here, based on the standards set forth above, is limited to a determination of whether FERC's actions were arbitrary or beyond their authority. In light of the Court's previous discussion on the issue of whether the FERC Orders were based on substantial evidence, it is clear that the Court agrees with the FERC's rationale for denying the motion to raise new facts. That is, the Court agrees that the only issue remanded and thus the only issue addressed by the Supplementary Remedial Orders was the amount of refund. Therefore, it was not arbitrary for FERC to deny SCT's motion to raise new facts about liability in its appeals from the Supplementary ROs.

Finally, SCT argues that FERC violated its own procedural rules by issuing the December 4, 1987, Order affirming the Supplemental ROs based upon an incomplete certified record. When FERC issued its December 4, 1987, Order, the record upon which it based its decision was missing eight documents. The oversight was not corrected until April 29, 1988, when the Chief Administrative Law Judge added the eight documents to the certified record. Subsequently, on June 3, 1989, in its Order Denying Reconsideration, FERC acknowledged the oversight and stated that "[t]he Commission has considered the entire certified record in reaching the decisions set forth in this order." R. 2569.

The FERC procedural rules state that the "Commission will upon consideration of its entire record, issue a final order...." 18 C.F.R. § 385.914. The question for the Court is whether that rule was violated. SCT asserts that the December 4, 1987, Order affirming the Supplemental ROs was the final order of the FERC and anything that the FERC did subsequent to that Order should be disregarded by this Court. If that were the case, then FERC would have affirmed the Supplemental Order on an incomplete record and violated its own procedural regulations.

DOE asserts, however, that the June 3, 1988, Order Denying Reconsideration was the final order of the FERC and that because it was based on a complete certified record, the FERC procedural rules were not violated. In light of the facts, DOE's position is more reasonable. Although the June 3, 1988, Order is titled "Order Denying Reconsideration", the Order did, in fact, consider the claims asserted by SCT. In the Order, FERC addressed the denials of the motions for oral argument and to raise new facts. In addition, the FERC stated that with that particular order it was affirming the Supplemental ROs on the basis of the complete certified record. Therefore, despite its title, the June 3, 1988, Order was the final order and because it was based upon review of the completed certified record, it did not violate FERC procedural rules.

The final question for this Court is whether the procedural irregularities described above constitute a "substantial" violation of SCT's due process. The United States Supreme Court has held that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). In *Mathews*, the plaintiff's Social Security benefits were terminated without the opportunity for an evidentiary hearing. Focusing on the fact that the plaintiff would subsequently have the opportunity for an evidentiary hearing and the recourse of judicial review before the administrative action became final, the court held that an evidentiary hearing prior to termination was not required by due process. *Id.* at 349, 96 S.Ct. at 909.

■ Here, SCT was afforded two oral arguments, one evidentiary hearing and substantial briefing resulting in a certified agency record in excess of 2500 pages. In addition, SCT has brought this action for judicial review of the administrative determination. It cannot be denied that SCT has been given the opportunity to be heard at a meaningful time, in a meaningful manner. Therefore, SCT's claim that its due process was violated is dismissed as being plainly without merit.

For all of the forgoing reasons, Defendants' motion for summary judgement is granted and Plaintiff's cross-motion for summary judgement is denied and, otherwise as appropriate, the Orders of the FERC are affirmed.