In re GREAT PLAINS
PETROLEUM, INC., Debtor.

Phillip D. ARMSTRONG, Trustee of the Estate of Great Plains Petroleum, Inc., Plaintiff,

v.

HIGHLANDS OPERATING COMPANY, INC., Defendant.

Bankruptcy No. 86–05305.
Adv. No. 89–7018.

United States Bankruptcy Court,
D. North Dakota.

Feb. 16, 1990.

Phillip D. Amrstrong, Minot, N.D., for trustee and plaintiff.

Marilyn Foss, Bismarck, N.D., for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

By adversary Complaint filed February 27, 1989, Phillip D. Armstrong, Trustee in the Chapter 7 case, seeks recovery and restitution from the defendant, Highlands Operating Company, Inc. (Highlands), for damages and losses to the estate allegedly caused by Highlands misfeasance and breach of fiduciary duty while in control of certain of the Debtor's property pre-conversion. The trustee also believes compensation paid to Highlands was excessive and ought to be reconsidered. The trustee asks for a full accounting by Highlands and forfeiture of their operating bond.

Highlands generally denies the allegations and counterclaims for additional earned but unpaid costs and expenses.

Trial was held on January 24, 1990.

### Findings of Fact

#### 1.

It would be impossible to begin discussing, let alone making sense out of the facts relevant to the trustee's claims for relief without first having an understanding of the cases procedural history and the relationship of the various parties.

The Debtor, Great Plains Petroleum, Inc. (GPP), was a North Dakota corporation engaged in the operation of oil and gas producing properties, pipelines and salt water disposal wells. The function of salt water disposal wells is to serve as a deposi-

tory for salt water generated from producing oil wells. In addition to being operator of wells, GPP also held a working interest in them.[1] GPP operated nine salt water disposal wells and fourteen oil producing properties in which it also had working interests.

In 1986 cash flow problems ensued due to several lawsuits and the hold back by working interest owners of payment for their share of well operating costs.

On April 7, 1986, one of the working interest owners brought suit in U.S. District Court for North Dakota seeking to have GPP placed in receivership. In consequence, a receiver was appointed. Following this event, on April 17, 1986, GPP filed for protection under Chapter 11 of the United States Bankruptcy Code. By adversary Complaint filed on May 2, 1986, GPP sought turnover and an accounting from the federal receiver. That action was shortly resolved by the federal receiver and GPP as debtor-in-possession agreeing to the appointment of a Chapter 11 trustee. On May 23, 1986, Questa Engineering Corporation was appointed trustee and several days later was appointed as an examiner with the powers of a trustee pursuant to section 1106 of the Code. Questa was authorized to operate the business of GPP and perform all duties of a trustee including the operation of the wells. Dissatisfaction with Questa's management performance caused GPP to request its termination as examiner which precipitated a negotiated plan of reorganization which, among other provisions, provided for a disbursing agent who would be responsible for payment of claims. What is noteworthy is that this agreement filed in March 1987

1. An "operator" of a petroleum producing property is the party who actually controls and conducts the day-to-day operations for the owners who are non-operators who have working interests or royalty interests in the property. *City of Long Beach v. Department of Energy*, 754 F.2d 379 (temporary emergency Ct. of App.1985). A "working interest" is an operating interest as distinguished from a royalty or non-working interest (sometimes called a net profit interest). As commonly used in the oil and gas industry, the term is generally synonymous with the term, "leasehold interest". *Miller v. Schwartz*, 354 N.W.2d 685 (N.D.1984). The concept of an operator must remain distinguished from an operating interest for, while some operators may also be working or operating interest owners, many are not but are merely employed by the working interest owners to manage the daily well operations.

also provided for the return of GPP control to GPP's sole shareholder, Tom Haugen.

In June 1987, Questa asked to be relieved of its examiner/trustee responsibilities. This issue came on for hearing on August 5, 1987, at which time the court was advised that a stipulation would shortly be filed resolving Questa's motion as well as other issues. The stipulation filed August 6, 1987, allowed for Questa's resignation and reinstatement of GPP as debtor-in-possession. However, as a part of the stipulation it was agreed that Highlands, a contract well operator based in Texas, would, subject to court approval and its election as operator by working interest owners, become operator of fifteen wells in which GPP had working interests. Its assumption of control would be effective July 1, 1987. The following is a list of the wells coming under Highlands' control and also sets out GPP's percentage working interest:

1. Cook N–1 salt water disposal (24%).
2. Dinwoody 22–23 salt water disposal.
3. Doris Slaaten 26–1 oil (7.5%).
4. George Tank 1 salt water disposal (8%).
5. Helling State 21–16 salt water disposal (90%).
6. Kannenberg 1–27 salt water disposal (72%).
7. Kostelecky 1 oil (56.25%).
8. Kostelecky A–1 oil (56.25%).
9. McMann State 21–16 oil (28.70%).
10. Sadowsky 1 salt water disposal (28.25%).
11. Signalness B–1 salt water disposal (36.87%).
12. Ralph Slaaten 23–1 oil (74.64%).
13. Helling State 16–11 salt water disposal (90%).
14. Sullivan 23–1 oil (30%).
15. Thorlackson 26–3 oil (75%).

GPP remained the operator of the seven other wells. The stipulation was approved by Order entered August 7, 1987. In September 1987, GPP asked to be reinstated as operator of the fifteen Highland operated wells. This motion was withdrawn but resulted in a stipulation being filed providing for GPP's reinstatement as operator of the following six salt water disposal wells effective November 1, 1987:

1. Helling State 21–16
2. Signalness B–1
3. Kannenberg 1–27
4. Helling State 16–11
5. Sadowsky A–1
6. Cook N–1

The stipulation was approved by Order entered December 4, 1987.

The Debtor's Second Amended Chapter 11 Plan filed on June 2, 1988, was confirmed by Order entered June 6, 1988. As confirmed the plan incorporated the terms of the August 6, 1987, stipulation by which Highlands remained as operator of the eight oil wells and the one salt water disposal well. When GPP failed to obtain funds necessary to fund the plan the case was converted to a Chapter 7 on November 21, 1988. Highlands then ceased to operate the nine wells remaining under its control effective November 1, 1988.

The Chapter 7 trustee was authorized to operate GPP's business and in April 1989 he sought authority to sell all of the Debtor's well related assets including GPP's working interests in the oil and salt water disposal wells. These efforts culminated in a court approved sale of all GPP's interests in the fourteen oil wells and nine salt water disposal wells to Great Dakota Oil Company, a company owned solely by Tom Haugen, the former owner of GPP. Great Dakota purchased these interests subject to all existing liens and encumbrances and without any warranty of title.

2.

Highlands itself never had a working interest in any of the wells but undertook their operation by virtue of the August 1987 stipulation between Questa, its predecessor operator/examiner, GPP, the Creditors Committee and working-interest owners who together agreed that Highlands would become the operator of the enumerated wells. The method of operation and duties imposed upon Highlands as operator were not set out in the stipulation itself but rather contained in a standard form operating agreement (American Association of

Petroleum Landsmen Form 610–1982) which is typical of agreements entered into between working-interest owners and operators. Working interest owners normally elect a person or company to be operator of a petroleum property and then engage his services by entering into an operating agreement. The August 1987 stipulation as it relates to Highlands is an election.[2]

The operating agreement in detailed terms sets out the duties incumbent upon an operator relative to a wells drilling and development, expenditures and liabilities of parties, leasehold acquisition, maintenance and surrender, and accounting procedures. It provides that the operator shall conduct and have full control of all operations on the land to be developed and shall have no liability to non-operators except as might result from gross negligence or willful misconduct. It allows for operator resignation upon ninety days notice or earlier where a successor assumes control. (Article V B(1)).

Although the stipulation provided an effective date of July 1, 1987, Highlands did not actually assume operational control of the fifteen wells until August 1987. For the month of July 1987, only accounting services were provided. The number of wells being operated by Highlands was reduced to nine on November 1, 1987, when operation of six salt water disposal wells was returned to GPP.

As a part of its accounting responsibilities under the agreement, Highlands as operator was to bill non-operators on a monthly basis for their share of charges paid and credits received from operations conducted on the well properties. These bills are commonly called joint interest billing statements (JIB's). Highlands did prepare and disseminate statements for each of the months July '87 through October 1988 setting forth the leasehold operating expenses for each well respectively and specifying GPP's proportionate share. The JIB's for July 1987 were prepared from Questa data. The only JIB's in evidence

are those pertaining to GPP's interest. There are no JIB's in evidence pertaining to any other working interest owners share. The trustee complains that the manner in which Highlands prepared the monthly JIB's was deficient but several witnesses, including the court approved disbursing agent, acknowledged that the JIB's as prepared by Highlands were accurate, contained a separate accounting for each well and contained no incorrect expense entries.

Some confusion arose over the transfer of JIB account receivables from Questa to Highlands upon Questa's June 1987 resignation as examiner/trustee. As of June 30, 1987, there was $183,305.58 in outstanding JIB receivables owing Questa from working-interest owners including $46,-611.47 due from L. Ron Hubbard for the months of April ($22,415.33), May ($11,-979.58) and June ($12,216.56). The documentary evidence is not complete with respect to the transfer of the JIB accounts from Questa to Highlands but presumably, based upon the lack of evidence to the contrary, it was done for the most part in a manner satisfactory to Questa and Highlands. The only discrepancy is as regards the Hubbard JIB's for May and June which were paid to Questa in August 1987, and who, after retaining $22,415.33, issued a check to Highlands on August 25, 1987, for the balance of $24,196.14. The disbursing agent believed he should have received this money because it was collected after the stipulation effective date. He further testified that GPP was never given credit for the full sum yet a JIB for November 1987, shows a credit entry of $10,659.00. The balance of the $24,196.14 transfer is unaccounted for. The JIB's in evidence reflect only the credits and charges for GPP and do not bear any information regarding other working-interest owners. Whether the unaccounted for $13,537.14 balance was credited to some other working-interest owner and therefore shows up on some other working-interest owners JIB's is un-

2. It is unclear from the facts whether a separate operating agreement was entered into for each well.

known. No evidence was introduced to clarify the point.

While agreeing that the JIB's completed by Highlands are accurate, the disbursing agent further testified that from his reconstruction of Highlands accounting figures there appeared to be revenues omitted of $29,530.00 from Cook N–1 which from his calculations would leave GPP with a net positive working interest share of $13,006.00 from fourteen wells (Dinwoody excepted). He could not explain, however, where his $29,530.00 omitted revenue figure came from explaining only that there must have been more water pumped into Cook N–1 from McMann State 21–16 than reported. These two wells are in a symbiotic relationship, with Cook N–1 serving as the disposal well for waste water generated by the McMann State oil well. The disbursing agent surmised that Cook N–1 must have taken a lot more water from McMann and other wells than was reported but no substantiating documentation was produced for this opinion. An accountant working for Great Dakota reconciled all of the salt water produced, concluding that 93,848 barrels were disposed of into Cook N–1, 56,495 barrels of which came from McMann which was billed $22,667.00 at forty cents per barrel. The remaining water came from other wells but he could not locate corresponding revenues credited to Cook N–1. Neither the disbursing agent nor Great Dakota's accountant knew exactly what the water disposal charge was but used a general industry standard. Tom Haugen figured that from November 1987, to the present, GPP should have received at least $47,000.00 as its share of salt water disposal fees earned on Cook N–1. The relevancy of this is unclear since GPP and not Highlands was the operator of Cook N–1 subsequent to November 1, 1987.

The well known as Ralph Slaaten 23–1 was a marginally producing well when Highlands took it over. Prior to that time it had on and off production periods with fairly high operating costs. The well required an acid wash job in January 1988, which is not unusual according to the contract pumper who did the work. Slaaten 23–1 is a difficult well with high daily maintenance costs. Tubing was stuck in the hole causing a five day shut down for retrieval in May 1988. Unsuccessful, Highlands had it shut in on May 12. Production resumed in July 1988. Over Highlands period as operator of Slaaten 23–1 expenses were incurred of $246,903.00 while only $53,346.00 in revenues were generated.

The operating agreements specifically provides that an operator shall not undertake any single project with an estimated expenditure of over $25,000.00 without the consent of all parties via a "authority for expenditure" (AFE) (Article III ¶ 2). No AFE was ever issued on the Slatten 23–1 well. Tom Haugen, the president of Great Dakota, could not point to any particular AFE violation nor could any other of the trustee's witnesses. According to the contract pumper, AFE's are not intended for normal day-to-day maintenance operations but only for special projects. None of the work done on Slatten 23–1, even though costing a considerable amount of money over fourteen months, was of the type regarded by him as requiring an AFE. The acid wash job done in January was the single largest expenditure with cost estimates being under $25,000.00. Indeed, the contract pumper knew of no project on any well that exceeded the $25,000.00 threshold limit.

During Highlands' operation, leases lapsed on Ralph Slaaten 23–1, Doris Slaaten 26–1, Kostelecky 1 and Kostelecky A–1. ASI, a working interest owner on the Slaaten wells stepped in and top leased the Slaaten wells. Apparently the leases were lost due to lack of production although this fact is not entirely clear. Whether the leases were of any value is wholly speculative due to the marginal nature of the wells and the costs of production. Both the Kostelecky wells had shown net revenue losses over the period of Highlands' operation as did the two Slaaten wells. The two Kostelecky wells were ultimately plugged and the equipment sold off. This belies testimony by Tom Haugen that Kostelecky was showing a net profit from a 240 barrel monthly production. Haugen felt that before allowing the leases to lapse that High-

lands, as operator, should have notified the working interest owners and the court. Article VIII of the operating agreement does provide that no lease covered by the agreement shall be surrendered until all parties consent.

When Highlands ceased its role as operator in November 1988 there remained a number of unpaid well-related bills on McMann, Slaaten and Dinwoody wells. The circumstances of these unpaid billings was not developed at trial. Great Dakota is now paying these obligations due to its purchase of GPP's working interest.

The foregoing are the most significant facts regarding Highlands' conduct while operating the wells. Despite these accounting problems and the discrepancies generated by them, no working interest owner ever made a demand upon Highlands for an audit as was their right under the operating agreement. Any requested audit, however, is to be conducted by the non-operators with its cost being borne by parties other than the operator. Accounting Procedure Joint Operations Article I ¶ 5.

### Conclusions of Law

Resolution of the issues raised does not turn upon an application of federal bankruptcy law but instead turns upon application of contract law. Highlands was not a court appointed examiner or receiver and did not embark upon its duties by reason of any bankruptcy court or Bankruptcy Code requirements. Rather, it was allowed by virtue of a stipulation between the working-interest owners including GPP, to assume the duties specified within the operating agreement which was a contract between Highlands, a non-interest operator, and the non-operator working-interest owners. The court and the Code played no part in forming this contractual relationship or the respective duties resulting thereby. All the stipulation of August 1987 did was to select an operator for certain properties. It did not set out any parameters of performance for Highlands.

The only cause of action available is for breach or negligent performance of the contractual obligations by Highlands. A party seeking damages on these grounds must prove the existence of the contract, its relationship to the act complained of and the value of the loss allegedly sustained. *Computec Systems Corp. v. General Automation, Inc.*, 599 F.Supp. 819 (D.C.P.R. 1984). In the instant case the trustee seeks recovery of what he believes are mis-allocated and omitted well revenues, loss of profits occasioned by unauthorized expenditures and lease lapses. He also requests an accounting. At this juncture, due to the sale of the estate's interest to Great Dakota, the trustee has no interest in the wells themselves. GPP's working interest was sold to Great Dakota who, as a consequence, became a party to the operating agreement and became successor to whatever contract rights GPP had. The only remaining cause of action the trustee has by virtue of the perceived contract breach is to recover damages equal to the amount by which the sole value of GPP's working-interest was diminished by Highland's breach or negligent performance.

Damages, like any other element of a cause of action, must be both pleaded and proved with the burden resting with the plaintiff to offer sufficient evidence to support the award. A party may not recover damages merely because they are asked for. *Ustrak v. Fairman*, 781 F.2d 573 (7th Cir.1986). The Eighth Circuit in *Vigano v. Wylain, Inc.*, 633 F.2d 522 (8th Cir.1980) stated with approval section 331 of the Restatement of Contracts:

> "Damages are recoverable for losses caused or for profits or other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Restatement of Contracts § 331

The facts as developed at trial are for the most part inconclusive as to whether Highlands breached the operating agreement. The court has before it what are apparently incomplete JIB records and those records that it does have pertain only to GPP's interest. To that extent the JIB's are accurate and complete and within the require-

ments of the operating agreement. No employee of Highlands was called to testify and the complete nature of the work performed by Highlands, the reasons for it and the expenses incurred on the various wells were left undeveloped. The trustee's cause for breach rests upon innuendo and negative presumptions but the facts themselves are less than clear. His cause falls short of the evidence necessary to establish "gross negligence or willful misconduct" which, under the operating agreement are the only grounds for operator liability.

Even if the court was satisfied that the trustee had carried his burden with regards to the issue of breach, the evidence falls far short of the standard of proof necessary to award damages. Absolutely no evidence at all was introduced bearing upon the value to the estate of GPP's working-interest unaffected by the acts of Highlands and the degree to which that interest lost value due to Highlands' acts or omissions.

On the matter of accounting, the court feels again that the duties imposed upon Highlands are defined by the operating agreement. Highlands has no Bankruptcy Code duty to provide an accounting. Aside from providing JIB's which it did, its only responsibility as operator was to submit to an audit paid for by the working-interest owners—an audit which has never been requested.

Finally, the facts are insufficient for either the return of compensation by Highlands or the award to it of additional compensation.

For the reasons stated, the court finds that the trustee fails in his proof and judgment may be entered in favor of the defendant, Highlands Operating Company, Inc., dismissing the complaint of the plaintiff, Phillip D. Armstrong, trustee of the estate of Great Plains Petroleum, Inc.

SO ORDERED.